THE PEOPLE *ex rel.* Chicago Bar Association, Relator, *vs.*
EDWARD J. ADER, Respondent.

*Opinion filed April 23, 1914.*

1. DISBARMENT—*to justify disbarment, case made must be free
from doubt.* To justify disbarment the case made must be free
from doubt, not only as to the act charged but as to the motive
with which it was done.

2. SAME—*when making false affidavit is not ground for disbar-
ment.* The fact that an attorney organizing a corporation for his
clients makes a false affidavit that the capital stock is paid in is
not ground for absolute disbarment, where he testifies that he was
informed by his clients that they had the money ready to pay in
as soon as it was needed by the corporation in its business.

3. SAME—*when an attorney should be suspended.* Where the
evidence shows that an attorney has been guilty of unprofessional
conduct in being connected with an oppressive and usurious loan
made by another party and has made a false affidavit that the capi-
tal stock of a corporation had been paid in, the affidavit being
made upon the representation of his clients that they had the
money ready to pay in, the attorney should be disciplined by sus-
pension, even though his disbarment is not justified.

INFORMATION to disbar.

JOHN L. FOGLE, for relator.

JOSEPH W. MERRIAM, (EDWARD D. SHURTLEFF, of
counsel,) for respondent.

Mr. JUSTICE FARMER delivered the opinion of the court:

This is a proceeding instituted for the disbarment of
Edward J. Ader, a member of the bar of this State prac-
ticing his profession in the city of Chicago. The amended
information contains ten counts or charges. Most of them
relate to alleged misconduct and dishonest practices in mak-
ing loans to various persons. Two counts charge the re-
spondent with misconduct and making a false affidavit in
procuring the incorporation of the United States Trust

Company.  Respondent answered the information, denying
substantially all the charges therein except the making of
an affidavit that all the stock of the United States Trust
Company was paid up when, in fact, none of it was paid.
The cause was referred to a special commissioner to take
and report the proof, together with his conclusions of law
and fact.  The commissioner heard the evidence and re-
ported that in his opinion the testimony sustained charges
in the information that respondent had been guilty of un-
professional and dishonorable conduct.

The most of the great mass of evidence heard by the
commissioner relates to the charges of misconduct of re-
spondent in connection with loans alleged to have been made
by him and one Lyman W. Rogers to various persons.  As
to most of the transactions charged against respondent in
connection with the money loaning business the proof con-
sists of the testimony of respondent and Rogers.  Their tes-
timony is in hopeless and irreconcilable conflict.  Rogers
testified respondent was engaged with him in the business
and furnished the greater portion of the money that was
loaned.  This is flatly denied by respondent.  The record
shows,—indeed, the testimony of Rogers himself shows,—
him to be a man without integrity of character and so un-
reliable that we would not be willing to rest a judgment
against anyone upon his testimony, alone.  He was in 1909
and 1910 a first-year student in a night law school.  For
a time in the fall of 1909 he was employed as a clerk by
Charles Cattern, a lawyer, who had desk room in respond-
ent's office.  Cattern left Chicago, but Rogers remained in
the respondent's office without any special arrangement or
agreement until February, 1910, when he was employed in
another law office as clerk.  He was engaged in making
small loans to real estate owners and taking quit-claim deeds
as security.  He charged the borrower $23 on each $100
loaned, in addition to six per cent interest.  This business
he carried on in respondent's office, which was in the Stock

Exchange building, 108 LaSalle street. He made a good many loans during the spring and early summer of 1910. As to one loan made during that period, other testimony than that of Rogers connects respondent with it in a way that we think merits censure. The loan we refer to is known in the record as the Horne-Bowser loan. Mrs. Horne had formerly been married to a man named Bowser, who died in 1889, leaving her as his widow and one son as his only child surviving him. Mrs. Horne seeing an advertisement in the *Chicago Daily News* in the name of respondent, 108 LaSalle street, offering to loan small amounts of money to property owners without mortgage, at six per cent interest, went to respondent's office. She testified she had two interviews with him before she saw Rogers, but that respondent told her she could get the loan and that Rogers was attending to that branch of the business. On her third visit to respondent's office, accompanied by her son, she saw Rogers, who prepared a note for $295, which she and her son signed. She and her son also signed a quit-claim deed conveying their property to Rogers and he gave her $250 in money. It would serve no useful purpose to respondent or to the profession for us to set out in detail the evidence of respondent's improper conduct in connection with this loan, and in view of the conclusion we have reached we deem it inadvisable to do so. It is sufficient to say that the Horne-Bowser note was disposed of by Rogers to one Dr. Burmaster. Before its maturity respondent wrote Mrs. Horne telling her when the note would become due and stating Rogers desired the money to invest in other business. This letter was written in September. On the 29th of July previous, Rogers had conveyed the property by quit-claim deed to respondent's wife but the deed was not placed on record until October 8. On receipt of respondent's letter Mrs. Horne applied to a real estate firm for a loan of $1200 on the property, and an investigation of the title by the real estate agents disclosed that the record showed it to be in

Rogers. They saw Rogers about it, and .he claimed the
payment of $60 before he would make a quit-claim 'deed,
and this was paid him. About that time they found re-
spondent or his wife claimed to have title to the property
to secure an indebtedness, as respondent claimed, from
Rogers to him of $352.50. This sum they were required
to pay before respondent's wife would execute a quit-claim
deed. Respondent had no note for the amount he claimed
Rogers owed him, and the loan agents were not informed
that the note Mrs. Horne and her son had given was in
existence and owned by Burmaster. Mrs. Horne and her
son were ignorant of business matters and claim they signed
what Rogers told them to when the loan was secured but
did not really know what they signed. Rogers claimed he
borrowed $100 or $200 for the benefit of respondent dur-
ing respondent's absence in New York and gave the note
to Burmaster as security. Burmaster testified he bought the
note and paid for it and did not hold it as security for
any loan that had been wholly or in part paid. In Janu-
ary, 1911, Burmaster took a judgment by confession against
Mrs. Horne and her son for $325, and that judgment re-
mains unsatisfied and unreleased. This is a mere outline of
the transaction connected with that loan, but the testimony
convinces us that respondent knew of it and was so con-
nected with it as to subject him to just censure but not to
permanent disbarment.

In April, 1910, respondent, Rogers and Earnest J. Car-
penter, a promoter of theatrical enterprises, conceived the
idea of organizing a corporation to be known as the United
States Trust Company. On May 3 they applied to the
Secretary of State for license to open books of subscription
to the capital stock. The object of the corporation was
stated to be "to act as agents for individuals, co-partner-
ship firms and corporations." Its capital stock was $50,000.
Carpenter advanced $100 to pay the license fee. In due
course after the license was obtained, respondent, Rogers

and Carpenter made a report to the Secretary of State that respondent had subscribed for 496 shares, and Rogers, Carpenter, one Gilday and one DeClerque each for one share of the capital stock, and that the entire capital stock of $50,000 had been paid up. This report was sworn to by respondent, Rogers and Carpenter before a notary public, and on its being filed with the Secretary of State a certificate of incorporation was issued. The fact is, and this is not denied by respondent, that not a dollar of the capital stock was ever paid. The only money paid by anyone was $100 advanced by Carpenter to secure a license to open books of subscription. Respondent's justification for his swearing that the capital stock was paid up is, that in organizing the corporation he was acting as attorney for Carpenter and that he subscribed for 496 shares of the stock for his client, as Carpenter did not desire at that time to have it known he was engaging in such an enterprise. Respondent testified he had no money to pay for stock in the corporation and did not intend to take any stock but was looking out for legal business, which was the only interest he had in the matter. He testified Carpenter represented to him he had the money to pay for the stock at a moment's notice. The arrangement was that Carpenter was to be elected treasurer of the corporation, and being its principal stockholder he would be able to hold and control the money paid in for the capital stock. Notwithstanding this arrangement, and notwithstanding the fact that respondent held the majority of the capital stock and that he and Carpenter were both present at the election of officers, Rogers was elected treasurer instead of Carpenter, and Carpenter appears to have made no objection to such election. Carpenter testified he owned property and money sufficient to enable him to pay for the stock of the corporation at the time it was organized, and among the available means he testified to having at that time was a large balance to his credit in the Corn Exchange Bank of New York City, vary-

ing from $10,000 to $40,000. After he had so testified, depositions of the officers of the Corn Exchange Bank were taken, and showed that during the months of April, May and June, 1910, Carpenter had an unvarying balance to his credit of $8.56. Carpenter testified he did not know the law required the capital stock to be paid up before the certificate of organization could issue, and that he intended to draw money from his funds in sums of from $1000 to $5000, as needed, to make loans by the corporation, and claims Rogers explained to him he would not have to pay the money in until it was necessary to use it in the business of the company. He could give no explanation why he was not elected treasurer of the corporation. Respondent claims that in organizing the United States Trust Company he was not acting in his individual capacity and in a business venture of his own, but was acting as attorney for the incorporators. He excuses his conduct in swearing to the report of the commissioners by saying that while it might not be strictly defensible, no injury resulted to anyone as no stock was ever sold or attempted to be sold and no business was ever transacted by the corporation. Carpenter claimed to have lost confidence in Rogers immediately after the corporation was organized and refused to have anything further to do with the company.

We think the evidence justifies the conclusion that Carpenter did not have the money to pay up the capital stock of the corporation, but it is not shown that this was known to the respondent. Respondent claims he believed and relied upon the representations of Carpenter that he had the money to pay up the capital stock at once, and felt justified, under the circumstances, in making oath that it was paid in. He claims to have acted in entire good faith and with no fraudulent motive or purpose. He claims that from his knowledge of the organization of corporations by other persons he did not understand he was committing a legal or moral wrong in making the affidavit.

The character of evidence that will justify the permanent disbarment of an attorney has been frequently defined by this court. In *People* v. *Matthews*, 217 Ill. 94, it was said only clear and satisfactory proof would justify a decision from which would flow consequences of such grave nature. In *People* v. *Harvey*, 41 Ill. 277, it was said the case made to justify disbarment must be clear and free from doubt, not only as to the act charged but as to the motive. These rules have been adhered to in many other cases too familiar to require citation. Under the rules announced in previous decisions, to justify permanent disbarment of respondent it would be necessary for the proof to show, beyond reasonable doubt, that he was guilty of the crime of perjury. It is true the affidavit he made was false, but we are not satisfied, beyond doubt, that he intended to commit deliberate and willful perjury. He was not justified in making the oath, but we cannot say the evidence shows, beyond reasonable doubt, that he knew he was committing perjury. We cannot say that if he were indicted and tried for that crime the evidence before us would result in his conviction. The discretion of courts in disbarment proceedings is not to be exercised in an arbitrary manner but in accordance with legal rules and principles for determining the guilt of the party charged. The man Lyman W. Rogers is in some way connected with every charge made against respondent. He was an unprincipled and untruthful schemer, and it was very unfortunate for respondent that he did not discover Rogers' true character at an earlier date and sever all relations with him. While endeavoring conscientiously to do no injustice to respondent, we cannot escape the conclusion that his acts and conduct in connection with the Horne-Bowser loan and in swearing that the capital stock of the United States Trust Company had all been paid up render it necessary for the good of the profession and the public that respondent should be disciplined, and after careful deliberation we have concluded that the ends of justice and

the public good will be served by a suspension of respondent from practice as an attorney for a period of two years and until a further order of this court, and it is so ordered.

*Respondent suspended.*