(No. 17166.—

THE PEOPLE *ex rel.* The Chicago Bar Association, Relator,
*vs.* WILLIAM A. BITHER, Respondent.

*Opinion filed February 20, 1929—Rehearing denied April 16, 1929.*

JOHN L. FOGLE, and HARRY EUGENE KELLY, (SIDNEY S. GORHAM, and HERBERT M. LAUTMANN, of counsel,) for relator.

EVERETT JENNINGS, (WILLIAM A. BITHER, *pro se,*) for respondent.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Respondent, William A. Bither, was admitted to practice law in this State in 1892, and he has been engaged in the practice of his profession in Chicago since that time. Upon an information filed by relator by leave of this court he was ruled to show cause why his name should not be stricken from the roll of attorneys and counselors at law

of this State. He filed an answer to the information, denying the charges contained therein. He also filed his motion asking that the rule on him to show cause why his name should not be stricken from the roll of attorneys be discharged. The matter was referred to Roswell B. Mason as special commissioner of this court, to take proofs and report the same to this court with his conclusions and recommendations. The proofs were taken and the report was prepared, finding that respondent was guilty of unprofessional and dishonorable conduct as an attorney and guilty of malfeasance in his office as an attorney, with a recommendation that his name be stricken from the roll of attorneys at law of this court. Objections by respondent to the report were overruled and the report was filed, and the objections are to be taken as exceptions in this court.

Respondent was appointed attorney for the board of education of Chicago in May, 1919, and he continued to act as such attorney until June, 1923. In order to provide school buildings and playgrounds for the school children the school board from time to time acquired, by condemnation and purchase, real estate for this purpose. The board had a business manager, whose duty it was to manage all property controlled by the board of education. It also had a real estate board, composed of its president, business manager, chairman of the buildings and grounds committee, chairman of the finance committee and the attorney, and all matters of purchase were referred to this committee. In 1920 the commissioner of public works of Chicago wrote the board of education that if the board would furnish the land near the Forrestville school, situated between St. Lawrence and Evans avenues and Forty-fourth and Forty-fifth streets, the city would equip it and furnish to the manager a playground adjoining that school. At a regular meeting of the board in February, 1920, it was decided to acquire seventy-two or seventy-three parcels of land from sixty-eight owners near the Forrestville school for

such playgrounds. About the same time the superintendent of schools recommended that the board secure additional playgrounds for the Wendell Phillips high school, situated on Thirty-ninth street. The board, in accordance with his recommendation, ordered the purchase of fifteen parcels of land belonging to Charles A. White, all but two of which contained buildings. Thereafter respondent, as attorney for the board, in carrying out the project caused notices to be sent to the owners of the land with reference to the purchase of the parcels and asking the owners to submit proposals of sale. Respondent then secured valuations of the property by experts and offered to purchase the property from the owners at twenty per cent less than the valuations fixed by the appraisal experts. The owners refused these offers, and as no amicable agreement for the purchase of those lots could be made, respondent began condemnation proceedings. After the filing of the petitions, and after writs had been served on the defendants in the condemnation proceedings, respondent again negotiated with the owners for the purchase of the lots, exclusive of the buildings thereon, and agreed upon the purchase price, and caused the owners to execute contracts in accordance with a printed form of contract of sale that had been in use in such cases for a number of years. The printed form of contract so used is as follows:

"The undersigned, owner of, [here is inserted description of premises;] does hereby agree to sell the said property to the board of education for the sum of..........dollars, less all liens, taxes, confirmed special assessments and incumbrances standing against the same, as full compensation for the taking thereof in condemnation proceedings now pending in the circuit court of Cook county by the board of education of the city of Chicago, and hereby consent to the rendering of a verdict and the entering of a judgment thereon in the above amount, and agree to deed the said property to the city of Chicago, in trust, for the use of schools, by warranty deed, and to furnish a merchantable abstract of title. Buildings to remain property of owner.

"Dated this.......day of............., 192....."

In all these printed contracts the words "buildings to remain property of owner" were written in the printed form in the handwriting of respondent. At the time of the signing of the contracts of sale by the property owners respondent asked them to execute bills of sale of the buildings on the various properties in all cases where they refused to take and remove the buildings. In all instances the names of the persons to whom such bills of sale should run were not given at the time of the signatures thereto of the owners, for the reason, as explained by respondent, he had not at that time disposed of the buildings to Henry W. Kaup. After the price for the various properties, exclusive of the buildings, was agreed upon and the contracts of sale entered into by the property owners, Ada Ketchem, an employee in respondent's law office, proceeded with the condemnation proceedings in the courts and the hearings were had as consent matters. Expert witnesses testified to the market value of the lots. Verdicts were obtained by a jury, on which judgments were entered. Where the buildings were retained by the owners the verdict and judgment stated that the buildings were to be retained and removed by the owners. After the proceedings in the court were concluded Ada Ketchem prepared for the respondent a report to the board of education, in which written report the description of the property, the purchase price, exclusive of the buildings, and a showing that the buildings so retained by the owner were to be removed, were set out. The report was printed in the regular proceedings of the board and at a regular meeting was approved and confirmed, and thereafter, by an order of the board, in which it was shown that the buildings had been retained by the owners, the award of the board in each case was deposited with the county treasurer by the auditor, and thereafter the property owners collected the amounts agreed upon from the county treasurer.

Of the sixty-nine owners of the property obtained by the school board, twenty-five testified concerning the transactions between them and respondent with reference to the sale of their property to the school board. Eight of these witnesses, Henry Slaughter, Orrin Stookey, Joseph W. Kiser, Edward H. Morris, Charles E. Kramer, W. B. Costello, Edward Miller and Charles A. White, testified that the words "buildings to remain property of owner" were not in the contracts at the time they signed them, and that the amount agreed upon between them and respondent as the purchase price of the property represented the price of the buildings as well as the land. The contracts signed by these parties were introduced in evidence, and each of them contained the words "buildings to remain property of owner" above the signatures. All of these witnesses signed a bill of sale of the buildings to Henry W. Kaup. Five property owners, Michael J. Carey, John A. Moody, F. L. Cuffe, James W. Clark and Sarah J. Clark, his wife, testified that they did not know whether or not the words "buildings to remain property of owner" were in the contracts at the time they signed them. These contracts were introduced in evidence and contained those words above the signatures of these witnesses. Each of them testified that at the time he signed the contract it was agreed that the buildings were also being sold, and respondent added to the purchase price of the Carey and Cuffe properties $250, to the Moody property $300, and to the Clark property $500 for the buildings, and that they signed the bills of sale of the buildings. Four other property owners, Luther Lucas, Walter Lovejoy, Orpheus Calloway and Alfred Demarais, did not remember whether or not the contracts signed by them contained the words "buildings to remain property of owner" at the time they signed them, but each testified that there was nothing said at that time or any other time about the buildings. They also signed the contracts of sale of the buildings. Four of the property

owners, Eleanor M. Moore, Birdie Wakefield, George T. Bailey and Eugenia C. Bridge, testified that the contracts as introduced in evidence containing the words "buildings to remain property of owner" were in the same condition at the time they were signed as when introduced in evidence, but each of them further testified that it was understood between them and respondent, at the time the contract was executed, that they were selling both the buildings and the land for the price mentioned in the contract. Four other property owners, Calvin W. Cooke, Norwood A. Thorne, Simon P. Gary and William A. House, testified that the contracts were in the same condition when executed by them as when introduced in evidence and contained the words "buildings to remain property of owner," and each of them stated that he understood that the purchase price mentioned in his contract was for the value of the land without the buildings and that the buildings were being retained by them. Elmer J. Schnackenberg, a lawyer representing the Kowalskis, who owned property that was sold to the school board, testified that he conducted the negotiations with respondent for his clients and that the contracts introduced in evidence were in the same condition as when signed by his clients and at that time contained the words "buildings to remain property of owner." He also testified that it was his understanding that the buildings were to remain the property of his clients, but that they did not desire to retain them and signed a bill of sale for the buildings to Kaup. Julius Stern, a lawyer representing a property owner named Berinstein, testified that he conducted the negotiations with respondent concerning the sale of Berinstein's property and that the words "buildings to remain property of owner" were inserted in the contract by himself and that he understood that his clients were retaining the buildings, but that after investigation it was found that it would be too expensive to remove the buildings from the land,

and they then executed the contract of sale of the buildings to Kaup.

Respondent testified that it was the general practice of the board of education to refer all matters of purchase to the committee of the board on direct purchases but that in these cases the business manager requested respondent to conduct the negotiations, and that in doing so he had the appraisal experts appraise the various properties and attempted to negotiate with the various property owners on the basis of the experts' reports but was unsuccessful. He then took the matter up with the committee on purchases of the board and told the members that it would cost at least $1000 per building to contest these cases, and that the fees of the expert witnesses and other expenses would amount to $70,000 or $100,000 in addition to the time of the employees of the legal department. He also told the committee that he had not tried to settle with any of the property owners by letting them retain their buildings, remove them and re-establish them on other lots; that it had been the custom for many years for the owners to retain their buildings and remove them; that the committee then agreed that respondent should conduct further negotiations with the owners by adding the probable costs of the condemnation proceedings to the value of the property as found by the experts, and should try to purchase the property by allowing the owners to retain the buildings and remove them elsewhere. He then called in the owners and proposed to them that they retain the buildings and remove them elsewhere if they desired so to do and in that way retain their homes, and that by this method he was able to negotiate with all of the property owners. The form of contract used by him in these negotiations had been in use for many years by the school board in such matters, and it was the custom to insert the words "buildings to remain the property of owner" where the owner was to retain and remove the buildings from the property. Where the buildings were

to be retained those words were written by respondent in the contract in the presence of the owner of the property and before it was executed. In a few instances property owners asked respondent what would happen if the seller concluded not to retain and remove his buildings, and he told them it would be better not to retain the buildings if the seller did not expect to remove them, and if the owner did not want to retain the buildings after signing the contract he should execute a bill of sale and respondent would endeavor to secure a wrecking company to remove the buildings. After these negotiations had been completed with the property owners the condemnation proceedings were conducted in the courts by Ada Ketchem, and judgments were obtained providing that the buildings were to be retained and removed by the owners in all cases where the contract contained the words "buildings to remain property of owner," and the negotiations and condemnation proceedings were reported by respondent to the board of education and were approved by it. After the owners who retained their buildings had been paid their money a great many of them decided that it would be too expensive to remove the buildings, and they came to respondent and informed him that they could not afford to remove the buildings and gave him a blank bill of sale of the buildings and authorized him to write some grantee's name therein, who would have authority to remove the buildings. In this manner respondent had fifty or sixty buildings on his hands which the owners had at first desired to retain but had later refused to remove and had executed such bills of sale. Respondent then took the matter up with John Byrne, a member of the board of education in charge of real estate, and asked him to take the buildings in the same way as if they had been included in the original condemnation proceedings. This Byrne refused to do, and said that the rule of his office was, where the building was to remain the property of the owner he would have nothing to do with the property, and that it

was up to the legal department to secure the removal of the buildings. The business manager of the board also refused to secure the removal of the buildings. Respondent then went before the board at one of its regular meetings and explained to it that in cases where settlements had been made with the owners with the provision that the buildings were retained and the owners had afterwards refused to remove the buildings he had obtained blank bills of sale for the removal of the buildings, and he had requested the business manager to remove these buildings but that he had refused. At that meeting the board refused to direct the business manager to remove the buildings, and informed respondent that it was his duty, as attorney for the board, to see to the removal of the buildings. Respondent further testified that at the time he received the bills of sale he did not know who would want the buildings, and therefore did not and could not insert any names as purchasers and explained to the owners why bills of sale were executed in blank; that he personally had no interest in the buildings and would have none, and that he would try and get some wrecker to remove the buildings without expense to the owner or to the board of education; that it was a difficult matter in 1920 and 1921 to secure a wrecker that would take and remove buildings unless they were practically new, or there was some vacant property immediately across the street to which they could be removed, or where they had some special salvage value more than an ordinary building, and that none of the buildings at these sites had any such special value. He testified that he telephoned to a number of wreckers that declined to take and remove the buildings on the terms that the buildings were to be theirs if they removed them. Henry W. Kaup was then induced by him to examine the buildings near the Forrestville school, and he told respondent he would remove some of them if he could have his choice of the buildings. Respondent refused to do that and told him that if he took any of the buildings

he would have to take them all and remove all of them. Kaup finally consented to this proposition and agreed with the respondent that he would remove all of the buildings within thirty days from the date of his contract, and Kaup himself wrote his name in some of the bills of sale that were delivered to him by respondent.

The lots near the Wendell Phillips school site were purchased of the owner in the same manner as the other lots, under the same contract that the owner was to retain the buildings thereon and remove the same. After the owner, Charles A. White, had received his money for the lots from the county treasurer's office he reported to respondent that it would cost him $4500 to remove any one of the buildings across the street therefrom, and that if he turned a corner it would cost him $1000 more for every corner turned in the removal of the building; that the buildings were built with party walls between each building and the buildings adjoining it, and that he could not move them without cutting out at least every other building; that there was no demand or sale for second-hand building material, and that he did not want the buildings and wanted to be relieved from his contract to remove them. The business manager of the board of education refused to move the buildings, and respondent agreed, after White refused to remove the buildings, to have someone remove them and had White sign fifteen bills of sale, one for each of the buildings. Respondent then took the matter up with Kaup to remove the buildings in consideration of the buildings so removed becoming Kaup's. Kaup at first refused to remove only a part of them on account of the party walls between the buildings, but finally agreed to take all of the buildings and remove all of them and received from respondent the fifteen bills of sale in blank, and respondent gave him permission to write his name in the blank spaces on the bills of sale. Respondent testified positively that Kaup never paid anything for the bills of sale to respondent, and that

respondent never received anything whatever of value for these buildings or any of the rent of the same that Kaup collected and was permitted to collect by the school board.

There is no evidence in the record that respondent ever received one cent from Kaup or anyone else for the buildings that were disposed of as aforesaid, and there is no evidence in the record that he ever conspired with Kaup to enable Kaup to defraud the board of education or any other person interested in the obtaining of the lots and the buildings for the purposes aforesaid. The board was apprised at all times that in the purchase of the lots it was only obtaining the title to the lots exclusive of the buildings, and the authority of the board to respondent to have the buildings removed was ample to warrant and to justify every action of respondent concerning their removal. The evidence further showed that no name was written in the bills of sale at the time respondent delivered them to Kaup, that Kaup's name was written in the bills of sale after they were delivered to him, and that all the owners of these bills of sale delivered them to respondent with the understanding that the name of the purchaser might be inserted in them.

The evidence shows that John E. Byrne, chief clerk of the bureau of real estate of the board of education and assistant manager, wrote a letter to respondent on October 22, 1920, asking his advice as to the buildings on the property taken by the school board and whether or not the buildings were to be disposed of to the highest bidder, stating in his letter that he was receiving daily inquiries concerning the same. In reply respondent stated that most of the buildings had been retained by the owners and that there would be nothing to sell on the lots of such owners. Thereafter respondent made a formal written report to the board, in which he again stated that the board had acquired only the land and that the owners had retained the buildings. Respondent stated that the negotiations with the owners of the various properties were taken up by him in August,

1920, and nearly all the cases were concluded by September 20, 1920, when judgments were entered in the condemnation proceedings.

The evidence also shows that promptly after disposing of the buildings to Kaup respondent began serving notices on the tenants of the buildings to vacate the same, so that the school board would have possession of the lots when the buildings were removed. These notices caused consternation among the tenants because of the fact that there was little or no building going on in Chicago at that time and that the tenants would not be able to find other tenements to which they could remove and live. There was so much pressure brought on the school board that against the protest of respondent it extended the time to Kaup to remove the buildings to the first of March, 1921, respondent explaining to the board that such action would so complicate matters that the board might be indefinitely kept out of possession of the lots for the purposes aforesaid. On or about February 1, 1921, respondent again began serving the tenants with notice to vacate the houses on the lots for the use of the board, and again, for the same reasons, the board took the responsibility of extending the time to Kaup for a year from March 1, 1921, so that the tenants might not be deprived of their homes and the opportunity to secure other homes. This further extension of time to Kaup was made against the advice and protest of respondent. It is also undisputed that respondent turned over the bills of sale procured from the various owners of the buildings to Kaup after having been authorized by the board and directed by it to dispose of the buildings and have the same removed from the lots. Respondent denied having received compensation of any kind from Kaup for such buildings and denied having received any part of the rent collected by Kaup therefrom, and there is no competent evidence in the record tending to prove that he did share in the rents collected by Kaup. During the time that Kaup was in con-

trol·of the buildings he collected upwards of $60,000 in rents, and additional money from the sale of some of the buildings and the building materials obtained from the wreckage of others. Kaup on different occasions paid to the school board the total sum of $9713.05 for ground rentals.

At the May term, 1922, of the criminal court of Cook county respondent and Kaup were indicted by the grand jury for conspiracy, in four counts. The first count charged a conspiracy to obtain from the board of education of Chicago a large amount of money, goods and personal property, to-wit, the sum of $21,500, by means and use of the confidence game; the second, a conspiracy to obtain said money by false pretenses; the third, a conspiracy to embezzle said money and convert the same to their use; and the fourth, a conspiracy to steal, take and carry away said sum of money. Thereafter respondent and Kaup were jointly tried in the criminal court on the indictment. The jury returned a general verdict of guilty against them, and judgment and sentence to the penitentiary were entered on the verdict. A writ of error was sued out by the defendants, and the judgment was reversed and the cause remanded by the Appellate Court for the First District for error in the admission of testimony against respondent and because of a variance in the proof as to the ownership of the property charged to have been obtained by conspiracy, etc. (*People* v. *Bither,* 231 Ill. App. 301.) On remandment to the criminal court a *nolle prosequi* was entered and the defendants were discharged and not again indicted.

At the hearing before the commissioner on the information to disbar, Kaup could not be found and his testimony could not be secured. It was stipulated that all evidence contained in the abstract of the record in the criminal case might be introduced in evidence before the commissioner, subject to any objections by respondent as to the competency or materiality of any of the evidence, that the

sworn answer filed by respondent should be accepted as his testimony, and that the same might be supplemented in any way that he might desire.

After the usual and formal allegations in the information, the charges therein made against respondent are substantially the following: Respondent had, on behalf of the school board, purchased the respective properties, including the buildings thereon, for the amounts mentioned in the printed contracts, and falsely informed the members of the school board that it did not buy any of the buildings. Thereafter he falsely and fraudulently secured the entry of orders in condemnation proceedings, which were conducted as required by law, allowing judgments for the amounts mentioned in such contracts to be entered in favor of the respective owners and limiting such judgments to the land; that thereafter Kaup, with the assistance of respondent, took possession of all of the buildings, claiming to be the owner thereof, and continued in the possession of such buildings for upwards of two years, and during such time collected rents on the buildings to the amount of more than $100,000; that during the time Kaup was in possession of the buildings he paid to the school board $10,000 as and for ground rent, but made no further account or payment to the board and claimed to be the owner of the buildings; that Kaup paid no consideration to the school board or to the former owners of the properties for the buildings and improvements; that while in custody Kaup confessed to members of the police department of the city of Chicago that he paid upwards of $20,000 for the buildings, "and your relator [the committee on grievances of the Chicago Bar Association] is informed and believes, and on such information and belief alleges," that said money, or a large part thereof, was paid by Kaup to and fraudulently converted by respondent; that Kaup procured other and additional sums of money by sales of buildings which were removed by the purchasers to other lots

and also by sales of building material upon the demolition of the same; that respondent fraudulently inserted in the contracts signed by Harry Slaughter, Michael J. Carey, W. B. Costello, Orrin Stookey, Joseph W. Kiser, Edward Morris, Charles A. White, Luther Lucas and Charles E. Kramer, after such contracts were duly executed by such persons, the words, "buildings to remain property of owner;" that respondent was guilty of fraud in representing to the school board that the contract price named in the printed contracts was for the land, only, when in truth and in fact such contract price was for both the land and the buildings thereon; that by reason of the foregoing, respondent actively participated in securing title to the buildings to pass to Kaup, and further assisted him to obtain possession of such buildings and to collect the rents therefrom and to obtain more than $100,000 in money, which belonged either to the city of Chicago for the use of schools or to the owners of the respective properties; that the actions and conduct of respondent were and are unprofessional and dishonorable; that they, and each of them, denote a lack of good moral character and are calculated to bring the courts of justice into disrepute and contempt and to tarnish the good name and fame of the legal profession, and that respondent has been thereby guilty of malfeasance in his office as an attorney of this court.

Kaup's confession to the members of the police department of Chicago to the effect that he paid upwards of $20,000 for the buildings, and his alleged statement to one Zeiger, who collected rents from the buildings for Kaup, that he paid for the bills of sale, respectively, a sum of money appearing in figures on a corner of those bills, were both inadmissible as evidence against respondent, as held by the Appellate Court. Neither said statement nor admission was made in Bither's presence and was not of acts done or declarations made in furtherance of an alleged conspiracy. The rule is well stated by the Appellate Court

in the criminal case that a mere narrative to a stranger, related during the pendency of the criminal enterprise but of a past event or occurrence, is as objectionable as if related after the criminal enterprise has terminated. This same rule was announced in *Spies* v. *People,* 122 Ill. 1, in these words: "It is undoubtedly the law that after a conspiracy is established only those declarations of each member which are in furtherance of the common design can be introduced in evidence against the other members. Declarations that are merely narrative as to what has been done or will be done are incompetent and should not be admitted except as against the defendant making them or in whose presence they are made."

There were in all thirteen objections to the commissioner's report by respondent. It is not necessary to consider these objections in detail. After carefully reviewing the evidence in the record we feel compelled to hold that it does not sustain the charges in the information. Every written document introduced in evidence, whether a contract for the sale of a lot or a bill of sale for buildings, corroborates the testimony of respondent to the effect that the words "buildings to remain property of owner" were in the contracts of sale when they were signed by the owners and that the owners signed bills of sale because they did not want to retain and remove the buildings. Respondent was further corroborated by a number of the owners, who testified that the words aforesaid were written in their contracts for sale of their lots before they signed them and that they signed the bills of sale for the buildings in blank. In fact, the whole evidence tends to corroborate respondent in his contentions. There is not a contention by any owner that he was cheated or defrauded by respondent in any way, or that he did not fully understand that he parted with every interest he had in the lot and buildings when he signed his contract of sale and his bill of sale. It also appears from the evidence in the record that the board of

education was fully apprised of every transaction by respondent, as to the amount it was to pay for the lots, and as to the fact that Kaup contracted with respondent to remove the buildings on the lots in consideration that he remove the buildings and retain them as his property. The extension of the time to Kaup to remove the buildings was not at the solicitation of respondent but was given under his protest on two different occasions, and after he had given all the tenants notice to vacate the buildings so that the board might promptly get possession of the lots for the purposes for which they were condemned.

The discretion of courts in disbarment proceedings is not to be exercised in an arbitrary manner but in accordance with legal rules and principles for determining the guilt of attorneys charged with disgraceful conduct, malfeasance in office or criminal conduct. While attorneys have been and must always be held to a high standard of honesty, still, when they are charged with offenses like those set forth in the information in this case, involving their professional career and those things that are as dear as life itself, such charges should not be sustained unless supported by satisfactory proof. The acts charged in this case are in their nature highly criminal, and such charges in an information to disbar must be proved beyond a reasonable doubt. (*People* v. *Sullivan,* 218 Ill. 419.) We have also held that where the act charged in a disbarment proceedings is a crime and there is a denial of the act and the testimony is conflicting, this court will exercise the power to disbar with great caution. *People* v. *Ader,* 263 Ill. 319; *People* v. *Meyerovitz,* 278 id. 356; *People* v. *Stonecipher,* 271 id. 506.

For the reasons aforesaid we hold that the commissioner's recommendation to disbar is not sustained by the evidence, and it is therefore disapproved and the rule against respondent discharged.              *Rule discharged.*