(Nos. 42359-42435 cons.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.*
THEODORE COLLINS *et al.,* Appellants.

*Opinion filed September 30, 1971.*

HOWARD T. SAVAGE, of Chicago, (GERALD WORKSMAN, *amicus curiae,*) for appellants.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, and JAMES B. ZAGEL, Assistant Attorney General, both of Chicago, (ROBERT A. NOVELLE, and GEORGE PAPPAS, Assistant State's Attorneys, of counsel,) for the People.

ANTHONY M. PECCARELLI, of Wheaton, and EDWARD G. TURNBAUGH, of Elmhurst, for the Illinois State's Attorneys Association, *amicus curiae.*

FREDERIC F. COHN, of Chicago, for the Association of Defense Lawyers, *amimus curiae.*

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

A jury in the circuit court of Cook County found the three 17-year-old defendants, Theodore Collins, Jessie Davis and LaMarr Masse, guilty of the murder of Roy Gutmann, and each was sentenced to imprisonment for not less than 100 nor more than 150 years. Nathaniel Plenty had been indicted with the defendants but was granted a severance. Direct appeals to this court upon constitutional grounds were taken by each defendant, and the cases were consolidated in this court.

About 9:00 P.M. on April 22, 1968, Roy Gutmann, 21, a student at the University of Chicago, was killed at 1309 East 56th Street, Chicago, by a shotgun shell fired into his head from a distance of a few feet. Three witnesses for the prosecution, James Richardson, 17, Gerald Wells, 16, and Gene Rogers, 15, were in the immediate vicinity when the shot was fired. Richardson testified that the three, together with Ronald Gentry, were at the intersection of 56th Street and Kimbark Avenue (1300 east) at about 9:00 P.M. They were walking west on the north side of 56th Street, which runs east and west. They passed three young Negro boys, whom they were not able to identify, walking east on the opposite side of the street. They also saw, about a half block behind the others, a lone Negro boy approaching the three. Richardson identified this individual as the defendant Davis and testified that "he had something, it was a barrel of—a rifle or shotgun * * * hanging by his leg." The Richardson group continued walking west, heard a shot, turned and looked behind them, saw nothing, and began to run. The testimony of Wells and Rogers was generally the same, but Wells was unable to identify the lone boy, while Rogers identified him as Davis but was unable to identify what he was carrying.

The State then called Joe Robinson, Jr., age 17, who testified that he had known each of the defendants for several years, but that he had not seen any of them on April 22, 1968. On the ground that it was surprised by Robin-

son's testimony, the State moved that he be called as a court's witness and supported its motion by reference to a statement he had allegedly made to the police on May 1, 1968. The motion was allowed. Robinson then testified on cross-examination by the State that the three defendants were his friends, and that he had seen each of them eight or ten times during April of 1968. He denied that he had had a conversation with a police officer in a police station concerning the Gutmann shooting. He was shown his alleged May 1 statement, and he then admitted that he had been in a police station. He testified that he remembered the preliminary questions that he had been asked and the answers that he had made to those questions, which concerned his name, address, age and the school he attended. The cross-examination continued, with the State's Attorney reading each question and answer from the statement. The attorneys for the defendants objected upon the ground that the statement was incompetent and inadmissible. The prosecutor replied that he was reading the questions and answers only "for the limited purpose of impeachment," and on that ground the court overruled the objection.

The witness Robinson denied making the following answers contained in his alleged statement:

"A. On the day this man was killed in Hyde Park they [Jessie, Theodore, Nate and my cousin "Lamont"] were all up there at my house about five oclock and Jessie had this package wrapped in a brown paper bag. Theodore asked my mother if I could go out to 63rd street to his grandmother's, and my mother said I couldn't go. My mother asked Theodore what he had in the package, and he said just some whiskey and my mother told him not to let the police catch him. About fifteen (15) minutes after five, they left and went out and Jessie and Nate went on down stairs and I saw Theodore look into the bag and I saw the shotgun and he was looking to see if any bullets and asked me if I

had any bullets and I told him I didn't have any and Lamont said he had some at home and Jessie told him to go and get them and they all left.

Q. When did you see them again?

A. When they all came back, Theodore and his little brother came back to my house about midnight and told me to keep quiet, and the next day Lamont told me what happened and that he had acted as look-out and Theodore shot a white man in Hyde Park, but he didn't tell me where the man was shot.

Q. Where did the shotgun that was used come from?

A. Lamont stole from his grandmother about two (2) weeks before this happened and his mother found it under the bed in his home and brought—I mean Theodore's mother found it under, the gun, under his bed after Lamont had brought the gun to Theodore's house and put it in the garbage can and Theodore took it out of can and brought it in the house. This is what Lamont told me. And Theodore told me he sawed the barrel off, and I saw it real smooth.

Q. Did Lamont tell you which way they went after the man was shot?

A. No he didn't tell me that.

Q. What kind of clothing were they wearing when they left your house?

A. They were all dressed in blacck (black) pants, black shoes and black jackets and Theodore had a ¾ length leather coat and he was carrying the gun.

Q. When they asked you to go with them did they tell you what they were going to do?

A. No, they didn't tell me what they were going to do.

Q. What did they tell you when they came back around midnight?

A. Theodore told me they had shot a white man

and the next day Lamont told me they had shot that man in Hyde Park.

Q. Have you seen Theodore, Lamont or any of the other two since the next day?

A. Lamont told me that the police picked him up and took him to question him about the man getting killed and that he didn't say anything. Theodore told me he was picked up about five o'clock and taken him to the police station and talked to him about the man who got killed and beat him up and told me that if the police picked me up for me not to say anything even if they beat me up.

Q. Did either Lamont or Theodore tell you anything about not knowing each other?

A. Theodore told me that the police asked Lamont if he knew him and Lamont said that he had never seen Theodore and asked me why Lamont would lie like that.

Q. Is there anything more you can tell us about this?

A. Right now this is all I know.

Q. Are you and Lamont in fact cousins?

A. Yes, my mother is related to his mother."

Robinson conceded that it was his signature which appeared on the statement, but he denied signing it, saying that he had signed his name on a card. On cross-examination by the defense, Robinson admitted that he went to the apartment of Masse's grandmother on May 19, 1968, and told Masse's mother and grandmother that the defendants did not shoot anyone and that he (Robinson) was present on the night when Bill Williams shot a white man. Robinson also testified that he thought Williams was then living in Virginia. He denied that he was related to LaMarr Masse.

On recross by the State's Attorney, Robinson testified that he told Masse's mother and grandmother, "LaMarr was nowhere around. It was just me and Bill." He also stated that he could not remember whether Gutmann was killed in Chicago, Cook County, or even in Illinois "because

it was dark." He then testified, however, that he thought the killing had occurred on a city street on April 26 between the hours of 8:00 and 9:00 P.M. Although he again said that he was present at the shooting, he nonetheless stated that he never actually saw Gutmann, and that he "couldn't say" whether Gutmann was shot to death. He testified that at the time of the shooting he stood two blocks away on the corner of 55th and Kimbark, but that he did not have a clear view of it "because too many peoples was round." Finally, Robinson maintained that although he did not see Gutmann's body after the shooting, he knew that Gutmann had been killed "[b]ecause all the peoples had started running towards the corner."

The State concluded its case in chief by calling four Chicago police officers. The first, Detective Eddie Hill, was shown the statement allegedly taken from Robinson on May 1. He identified it and said that he had questioned Robinson on that date and recorded his statement. The prosecution was allowed, over the defendants' repeated objections, to read again some of the questions and answers from the statement, and the court told the jury that this was being done solely for the purpose of impeaching Robinson's credibility. Hill also testified that Robinson had signed the statement in his presence. On cross-examination he stated that all three defendants had been arrested on the basis of Robinson's May 1 statement.

Detective Rudolph Nimocks testified that he also was present with Hill on May 1 when Robinson gave his statement. He identified the statement and testified that he was present when it was read to Robinson and when Robinson read, corrected, and signed it. The third officer, Detective John Fitzgerald, testified that the witnesses Rogers and Richardson had identified pictures of the defendant Davis from pictures of male Negroes.

Finally, Detective Joseph Marin identified a statement concerning the Gutmann murder which was allegedly taken

from Collins on May 11, 1968. Defense counsel repeatedly objected, and, ultimately, after an off-the-record discussion in chambers, the defendants' motion to strike was granted, and the jury was instructed to disregard Marin's testimony concerning the statement.

For the defense, Masse's mother and grandmother testified that he was at home all evening on April 22, 1968. They also testified to Joe Robinson's visit on May 19, 1968. Masse's grandmother summarized Robinson's statements that night as follows: "He said Bill had come to his house and asked his mother, could he go with him, and she let him go with him, and they went out and Bill killed the Gutmann boy, and he had a gun in his sack, a double barrel shotgun, and they went away, and Bill told him, if you tell this on me, I will kill you." Masse's mother testified that on May 19 Joe Robinson "told us * * * that LaMarr, my son, did not kill anyone, and he came to tell me that he and Bill was together the night the boy was killed and * * * Bill shot the boy and propped him up on the fence and they ran * * *." Masse's brother and a family friend corroborated the testimony of his mother and grandmother.

John Billups, a neighbor of both Robinson and Collins, testified that he had known Howard Bill Williams since about April of 1968, that Williams had lived by himself at 4934 Forrestville, and that he had seen Robinson and Williams together "sometime in April * * * between Forrestville and Vincennes." Billups further testified that he was present at the office of one of the defense attorneys, along with that attorney and one "Coconut" Pates, when Williams "said that Joe Robinson had had him picked up by the police and told the police that he [Williams] had killed Gutmann." Billups stated that Williams then signed a statement to that effect. The statement was marked as an exhibit, but the prosecution's objection to its admission in evidence was sustained on the ground that no showing had been made of the unavailability of "these witnesses."

Theodore Collins testified in his own behalf and stated that on the night of April 22, 1968, he did not leave his home between 6:00 and 10:45 P.M. He also testified that Jesse Davis came over to his house at "6:30, 6:35" and remained there until 10:45. His sister, father, and a neighbor who had visited his house that night corroborated his testimony.

Jesse Davis also testified that on the night of April 22, 1968, he was at Collins' home from "about 6:30 or 6:35" until "about 11:00." He stated that he then left Collins' house and went straight home.

On rebuttal, the State called the parents of Joe Robinson, Jr. His father testified that LaMarr Masse was at his home on April 22 for "something like about an hour" beginning at 6:00 P.M. "[T]wo or three others" were also present. Mrs. Robinson testified that she was home with her husband and son "all of the evening" after 6:00 P.M. She stated that "Jamart," whom she identified in court as the defendant Masse, also was at her home from about 6:00 P.M. until "about quarter to 7:00." Although she implied that others besides Masse were present that night, she was unable to recognize any other visitors after looking around the courtroom.

Apart from Robinson's alleged May 1 statement, the only evidence offered by the prosecution which connected the defendant Jesse Davis with the offense was the testimony of James Richardson and Gene Rogers. Each of them identified Davis as the lone boy near the scene of the crime who appeared to be carrying something. Rogers was unable to say what he was carrying, but Richardson testified that he saw what looked like the barrel of a rifle or shotgun. Of their two companions, Wells could not identify anyone, and Ronald Gentry was not called as a witness. No prosecution witnesses identified Theodore Collins or LaMarr Masse as having been near the scene of the crime, and unless the jury was properly permitted to consider the statement of

Joe Robinson as substantive evidence, no evidence was offered to connect either of them in any way with the crime.

Throughout the trial, and until the case was submitted to the jury, both the prosecution and the trial judge repeatedly asserted that Robinson's statement was being offered and received solely for impeachment purposes to reflect upon Robinson's credibility. But at the instruction conference after both sides had rested, the judge refused instructions tendered by the defendants which told the jury that they were to consider the statement only by way of impeachment, and not as evidence of the innocence or guilt of the defendants. The only advice the jury received concerning the use they were permitted to make of Robinson's statement was that given by one of the Assistant State's Attorneys in his argument to the jury: "*  *  * You will be able to take that statement back and make your own determination. You will have an opportunity to determine what weight you should give that statement, the believability. It will be your determination, ladies and gentlemen of the jury."

The defendants contend that it was error to permit Robinson's statement to be received in evidence without a limiting instruction, while the prosecution argues that Robinson's statement was properly put before the jury as substantive evidence. An *amicus curiae* brief filed on behalf of the State's Attorneys' Association urges that this court re-examine the present Illinois law, and adopt a rule which permits the introduction as substantive evidence of a prior inconsistent statement made by a witness who testifies at the trial. An *amicus* brief in opposition was filed by the Association of Defense Lawyers. Discussion of these arguments and suggestions will be deferred until other contentions of the defendants are disposed of.

We turn first to contentions related to the argument of the prosecution. In the prosecution's closing argument the following occurred:

"MR. PARRISH : Now, ladies and gentlemen, that is important because if you note from the evidence in the record, all witnesses testified that the streets were clear, that there were no other persons on the street except the four boys on one side of the street constituting the State's witness, and the boys on the other side of the street constituting the defendant and—strike that—constituting the three defendants. Therefore, if you believe, since it is unimpeached, the witnesses of the State, that they saw these persons at the scene of the occurrence, you must find them guilty of murder in manner and form as charged in the indictment by virtue of the fact that these defendants took and utilized an alibi defense. That defense—

MR. SAVAGE : Judge, may I object to the misstatement of the law to this jury ?

THE COURT : The objection is overruled. Proceed.

\* \* \*

MR. PARRISH : That defense presupposes that the defendants did not, in fact, know anything about the crime. That defense presupposes that they were away from the scene of the crime, and we submit respectfully to you that when defendants utilize an alibi defense, they must be judged by you on the reasonableness of the story that they have propounded.

MR. SAVAGE : Judge, may I object respectfully to a misstatement of the law ?

THE COURT : The objection is overruled.

MR. PARRISH : Specifically, when defendants elected to just file or explain their presence at or near the scene of the crime while denying participation, they must tell a reasonable story or be judged by its improbability, and we submit to you—

MR. SAVAGE : I object again, Your Honor.

THE COURT : Overruled."

Factually, the argument was not true. No witness had testi-

fied that he saw all the defendants at or near the scene of the crime. The legal doctrine repeatedly asserted by the prosecution and approved by the trial judge "unequivocally placed upon a defendant the burden of establishing an alibi," and was erroneous. (*People v. Pearson* (1960), 19 Ill.2d 609, 614.) Moreover, the prosecution told the jury that if the defendants did not meet that burden, they were guilty of murder.

The trial judge also refused the following instruction concerning the effect of an alibi upon the burden of proof which was tendered by the defendant: "Defense Instruction No. 9. The jury is instructed that the introduction of testimony by the accused to prove an alibi does not shift the burden of proof from the prosecution to the accused, but that the prosecution is bound to prove the presence of the defendant beyond a reasonable doubt, and if the evidence on this subject considered with all the other evidence is sufficient to raise a reasonable doubt as to the guilt of the defendant, you should acquit him."

The People contend that this instruction was properly refused because it was repetitious of defense instruction No. 10, which is identical with the instruction set forth in full in *People v. Pearson* (1960), 19 Ill.2d 609, 614. The most pertinent part of that instruction told the jury that: "As regards the defense of an alibi, the jurors are instructed that the defendant is not required to prove that defense beyond a reasonable doubt, to entitle him to an acquittal. It is sufficient, if the defense upon that point raises a reasonable doubt of his presence at the time and place of the commission of the crime charged, and if it does, it is your sworn duty, under the law to give the benefit of the doubt to the defendant and to find him not guilty." In our opinion the refused instruction was not repetitious. The unusual situation created by the prosecutor's misstatements, both of the facts and of the legal consequences that attended the assertion of an alibi, coupled with the court's apparent approval

of those misstatements, made it essential that, at the least, an instruction specifically stating the effect of the assertion of an alibi be given.

The constitutional effect of an instruction which placed upon the defendant the burden of establishing an alibi defense was recently before the Supreme Court of the United States and the United States Court of Appeals for the Eighth Circuit. The situation was thus described by the Supreme Court:

"In 1934, petitioner was indicted for murdering a policeman in Burlington, Iowa. Petitioner claimed that he was innocent and that he had not been present at the scene of the crime. At the trial, several witnesses testified that petitioner had been in Des Moines, 165 miles away from Burlington, on the day that the crime was committed. The trial judge instructed the jury that for the petitioner to be entitled to an acquittal on the ground that he was not present at the scene of the crime, the petitioner must have shown by a preponderance of the evidence that he was not present. The jury found petitioner guilty of second-degree murder, and petitioner was sentenced to life imprisonment. His conviction was affirmed by the Iowa Supreme Court. *State* v. *Johnson,* 221 Iowa 8, 264 N.W. 596 (1936).

"In this habeas corpus proceeding, petitioner argued, among other points, that the State had denied him due process of law by placing on him the burden of proving the alibi defense. The United States District Court for the Southern District of Iowa rejected this argument and denied the petition. The United States Court of Appeals for the Eighth Circuit affirmed. 386 F.2d 677 (1967). We granted certiorari to consider the constitutionality of the alibi instruction, along with other issues. 390 U.S. 1002 (1968). After we granted certiorari, the Court of Appeals for the Eighth Circuit, sitting en banc, held in another case that the Iowa rule shifting to the defendant the burden of proving an alibi defense violates the Due Process Clause

of the Fourteenth Amendment. *Stump* v. *Bennett,* 398 F.2d
111 (1968). In view of that holding, we vacate the de-
cision in this case and remand to that court for reconsidera-
tion." *Johnson v. Bennett* (1968), 393 U.S. 253, 253-55, 21
L. Ed. 2d 415, 415-16, 89 S. Ct. 436.

On remand, the Court of Appeals reconsidered the
*Johnson* case *en banc,* with supplemental briefing and argu-
ment. The opinion for the court, written by Judge Blackmun,
pointed out that the instructions given upon Johnson's trial
contained "numerous references, at least 13 by our count,
to the effect that the state had the burden of establishing
the material charges of the indictment, including time and
place, beyond a reasonable doubt, that 'the innocence of the
defendant will be presumed,' that the jury's determination
is to be made in the light of all the evidence, and the like."
Nevertheless, the court held, following its own decision in
*Stump* v. *Bennett* (1968), 398 F.2d 111, *cert.* denied, 393
U.S. 1001, 21 L. Ed. 2d 466, 89 S. Ct. 483, that the error
in the instruction had deprived Johnson of due process of
law.

In our opinion the uncorrected statement of the prosecu-
tor in the present case as to the consequences of introducing
testimony that the defendants were not present at the scene
of the crime was at least equally serious. The fact that the
jury does not believe a defendant's testimony as to his exact
whereabouts at the time of the crime, does not mean that
he is guilty. Yet this is what the jury in the present case was
told was the applicable law, reiterated after the trial judge
had overruled the defendants' objection. The burden that
rests upon the prosecution to prove the defendants' guilt
beyond a reasonable doubt is not so readily discharged.

The defendants also contend that the prosecution's argu-
ment was so misleading and prejudicial in many other re-
spects as to deprive them of a fair trial. The responses to
some of these instances, quoted from the State's brief,
show both the quality of the argument and the justification
advanced for it.

"The remark by the Assistant State's Attorney that Davis was identified 'as one of the assailants who allegedly shot and killed Mr. Roy Gutmann at 1300 East 56th Street' was objected to by defense counsel. The court's sustaining of the defense objection and the court's comment that such a matter was not in evidence (A. 319) were sufficient to erase any and all prejudicial effect that such a comment may have had on the jury. People v. Farmer, 28 Ill.2d 521, 524 (1963)."

"The arguments by the State that the jury would have to bring some law and order and if the jury did not make a finding of guilty then the judge, sheriff and State's Attorney might as well be fired were objected to by the defense and the objection was sustained. This eliminated any and all prejudicial or inflammatory impact such comments may have had on the jury. People v. Farmer, 28 Ill.2d 521, 524 (1963)."

"The prosecutor's comment concerning defendant Masse fleeing from his home was objected to by the defense, the objection was sustained and the jury was instructed to disregard the comment (A. 333). Therefore, no prejudice can be said to have occurred in this instance. People v. Farmer, 28 Ill.2d 521 (1963).

"The court's sustaining defense objection to the comment that the motive of the crime was the fact that the victim was a white man removed all prejudice such comment may have created (A. 334). People v. Farmer, 28 Ill.2d 521 (1963)."

"The Assistant State's Attorney's remarks, that it was not logical for Davis' mother to have allowed the police to keep her son in custody since she knew he was at home on the night of the incident was objected to by the defense and the sustaining of the objection removed all prejudicial effect the statement may have had. People v. Farmer, 28 Ill.2d 521 (1963)."

"The Court sustained defense objection to the prose-

cutor's remark concerning the reasonableness of defendants' alibi. The objection being sustained and the court's characterization of the remark as being improper removed any and all prejudicial impact such a comment may have had. People v. Farmer, 28 Ill.2d 521 (1963)."

"The prosecutor's statement that three persons had placed defendants in the Robinson home on the date of the incident was a misstatement of the facts. However, the Court sustained the defense objection and corrected the prosecutor by stating that only two witnesses had testified that one defendant, Masse, was in the home (A. 341-342).

"The prosecutor's remark that two eyewitnesses had placed defendant Davis at the scene of the killing was not unreasonable since based on the testimony of two State's witnesses who saw the defendant walking in the direction from where they heard the shot; it was proper argument based on evidence. People v. Ostrand, 35 Ill.2d 520 (1966).

"Defense objection to the prosecutor's reference to defendants as punks and murderers was sustained, and, thus any impropriety of such a remark was brought to the jury's attention."

In our opinion the erroneous and uncorrected statement to the jury as to the effect of defense testimony that the defendants were not present at the scene of the crime, requires that the judgments be reversed. The inaccurate and unfair quality of the prosecutor's argument to the jury leads to the same result. The judgments are therefore reversed and the cause is remanded for a new trial.

There remains for consideration the question of the effect to be given to Robinson's statement upon a new trial. Are the matters contained in that statement to be given weight as substantive evidence, or is their effect to be limited to an attack upon his reliability by showing that he has not always told the same story that he now tells?

It has been the rule in this State, as it has been the rule generally in this country, that only the testimony given by the witness upon oath in court, subject to cross-examination, is to be considered as substantive evidence, and that a prior contradictory statement of a witness is received in evidence only for the purpose of impeaching the credibility of the witness. This court's position was emphatically stated in these terms in *People* v. *Paradise* (1964), 30 Ill.2d 381, 383:

"This court has consistently held that evidence of prior inconsistent statements by a witness is admissible to impeach his credibility. (*People* v. *Morgan*, 28 Ill.2d 55; *People* v. *Moses*, 11 Ill.2d 84; *People* v. *Biloche*, 414 Ill. 504; *People* v. *Smith*, 391 Ill. 172; *People* v. *Gleitsmann*, 361 Ill. 165; *People* v. *Romano*, 337 Ill. 300; *People* v. *Graves*, 331 Ill. 268; *People* v. *Popovich*, 295 Ill. 491.) The admission of such evidence is premised on the fact that its exclusion would deprive the party seeking to use it of his opportunity to exhibit the truth and in leaving him the prey of a hostile witness. (3 Wigmore on Evidence, 3rd ed. sec. 903.) It must be recognized, however, that in criminal cases these extrajudicial statements are often highly incriminating and are usually made outside the presence of the defendant. To give these statements substantive value would allow an accused to be convicted on extra-judicial statements of witnesses—a practice that runs counter to the notions of fairness on which our legal system is founded. (*Bridges* v. *Wixon*, 326 U.S. 135, 89 L. Ed. 2103, 65 S. Ct. 1443.) Therefore, prior self contradictions are not to be treated as having any substantive or independent testimonial value. *People* v. *Morgan*, 28 Ill.2d 55; *People* v. *Moses*, 11 Ill.2d 84; see also 3 Wigmore on Evidence, 3rd ed. sec. 1018; McCormick on Evidence, sec. 39.

"While we have recognized the necessity for, and permitted the use of, contradictory statements for impeachment, we have also recognized the danger that the out-of-

court statement may be taken by the jury as substantive testimony in place of the statement on the stand. As a practical matter, it may be impossible for a juror to consider extrajudicial statements as bearing on the credibility of the witness and avoid being influenced by it as substantive evidence on the main issue, (see McCormick on Evidence, sec. 39,) but the difficulty of the mental operation the law asks a juror to make in considering evidence for one purpose and not another does not convince us that convictions should be based on out-of-court statements of witnesses who will not affirm these statements in a public proceeding. Accordingly, this court has refused to allow a conviction to be based solely on unsworn statements by witnesses (see *People* v. *Tate,* (No. 36481) *post,* 400; *People* v. *Newman,* (No. 37735) *post,* 411, or to permit such unsworn statements to be offered virtually for the purpose of using them as testimony. (*People* v. *Barragan,* 337 Ill. 531.) And, to lessen the risk of the properly admitted prior inconsistent statement of a witness being considered by the jury as testimony, this court has required that the impeachment not be repetitious (*People* v. *Moses,* 11 Ill.2d 84,) and that the jury be clearly cautioned and instructed to limit its consideration of such evidence for its proper purpose. *People* v. *Tunstall,* 17 Ill.2d 160."

The orthodox view, expressed in *People* v. *Paradise,* has been criticized by legal scholars upon several grounds. (See McCormick on Evidence, sec. 39; 3 Wigmore on Evidence, sec. 1018.) Rule 63 of the Uniform Rules of Evidence would admit as an exception to the hearsay rule "a statement previously made by a person who is present at a hearing and available for cross examination with respect to the statement and its subject matter, provided the statement would be admissible if made by declarant while testifying as a witness." (See also A.L.I. Model Code of Evidence, Rule 503.) The proposed Federal Rules of Evidence for the United States District Courts and Magistrates accomplish

the same result by excepting from its definition of hearsay the prior declarations of witnesses. Rule 801(d) provides:

"(d) Statements Which Are Not Hearsay. A statement is not hearsay if

(1) *Prior Statement by Witness.* The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (i) inconsistent with his testimony, or (ii) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive, or (iii) one of identification of a person made soon after perceiving him." 51 F.R.D. 315, 413.

In 1970 the Supreme Court of the United States overruled a decision of the Supreme Court of California which had held that, as applied to criminal cases, the confrontation clause of the sixth amendment and the due process clause of the fourteenth amendment to the constitution of the United States were violated by a section of the California Evidence Code which permitted the use of a prior contradictory statement as substantive evidence. (*California* v. *Green* (1970), 399 U.S. 149, 26 L. Ed. 2d 489, 90 S. Ct. 1930.) In that case, as well as in *Dutton* v. *Evans* (1970), 400 U.S. 74, 27 L. Ed. 2d 213, 91 S. Ct. 210, and in *Nelson* v. *O'Neil,* 402 U.S. 622, 29 L. Ed. 2d 222, 91 S. Ct. 1723 (1971), the Supreme Court refused to hold that the Federal constitution prohibited the States from using out-of-court statements of witnesses as substantive evidence. The Supreme Courts of Wisconsin and Kentucky have recently permitted the use of prior inconsistent statements of eyewitnesses who were members of the defendants' families, as substantive evidence in criminal cases. (*Gelhaar* v. *State* (1969), 41 Wis.2d 230, 163 N.W.2d 609; *Jett* v. *Commonwealth* (Ky. 1969), 436 S.W.2d 788. See Notes, 1970 Wis. L. R. 202; 36 Tenn. L. R. 812.) On the other hand, the United States Court of Appeals for the Third Circuit held that the orthodox view still governs in Fed-

eral cases, and reversed a judgment of conviction because the statement of a co-defendant, which he repudiated on the witness stand, was submitted to the jury as substantive evidence against the defendant. *United States* v. *Small* (3d cir. 1971), 443 F.2d 497.

The State has urged that we now overrule the doctrine that this court has heretofore followed, and affirm the judgments in the present case upon the ground that the trial court properly allowed the jury to give substantive weight to Robinson's statement. This we have refused to do. It is apparent that the evidence offered by the prosecution, apart from Robinson's statement, fails to establish the guilt of any of the defendants beyond a reasonable doubt. It was not until the State's case was closed that the trial judge ruled that the usual rule would not be applied, and that the jury could give substantive weight to Robinson's statement if they saw fit to do so. In our opinion, even if we were fully persuaded as to the wisdom of the change in the rules of evidence that is urged upon us, it would be basically unfair to apply such a significant change in doctrine without advance notice to all parties.

We have given careful consideration to the suggestion of the Association of State's Attorneys concerning the adoption of a rule of this court to govern future cases. That suggestion was expressed in the following terms:

"Amicus Curiae strongly urges this Court to consider granting to trial courts wider discretion to admit such evidence of high and assessable probative value. Exercise of discretion rather than unrealistic mechanical rules is required.

"Amicus Curiae respectfully request that the present law in Illinois pertaining to prior inconsistent statements be reexamined. In strongly urging that a rule be adopted which permits the introduction as substantive evidence of a prior inconsistent statement made by witness who testifies at trial, we submit that no distinction be made between unsworn as

well as sworn statements, unsigned as well as signed statements, written as well as oral statements subject to the qualification that there is clear and convincing proof that the oral statement was made.

"In this manner the prosecution and the defense can better achieve the objective of an adversary proceeding, to determine the truth."

The considerations that support the admission of prior out-of-court statements as substantive evidence in criminal cases also support their admission as substantive evidence in civil cases, yet so far as we are aware, the use of such evidence in civil cases has been generally rejected. (*State* v. *Saporan* (1939), 205 Minn. 358, 285 N.W. 898; *Ruhala* v. *Roby* (1967), 379 Mich. 102, 150 N.W.2d 146.) Our present method of trial contemplates basically that in criminal cases and civil actions at law all of the evidence is to be presented at a single time and place in a continuous proceeding. If all prior statements of witnesses are to be put before the jury or the judge as substantive evidence, the logistical problems of a trial—already serious—will be enhanced because it will be necessary to have present at the time and place of the trial not only those persons who witnessed the occurrence at firsthand, but also those persons to whom the firsthand witnesses have made statements about the occurrence, either orally or in writing.

We are unwilling, at this time and upon the basis of the experience and opinion presently available, to adopt a rule which permits the substantive use of prior out-of-court statements of witnesses.

The judgments of the circuit court of Cook County are reversed, and the cause is remanded for a new trial.

*Reversed and remanded.*