(No. 49417.-

*In re* MICHAEL ROBERT KIEN, Attorney, Respondent.

*Opinion filed December 12, 1977.*

John C. O'Malley, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

Harry J. Busch and Sherman C. Magidson, of Chicago, for respondent.

MR. JUSTICE RYAN delivered the opinion of the court:

The Administrator of the Attorney Registration and Disciplinary Commission filed a complaint which charged the respondent, Michael Robert Kien, with conduct which tends to defeat the administration of justice and bring the courts and legal profession into disrepute in that he paid $50 to a testifying police officer while defending a criminal case. Prior to this disciplinary action, respondent had been indicted and acquitted of bribery and suborna- tion of perjury for the same act. After a hearing, a hearing panel of the attorney disciplinary system found miscon- duct and recommended suspension for 30 days. The Administrator filed exceptions to the findings and recom- mendation of the hearing panel, seeking a substantially greater sanction. The Review Board subsequently set aside the hearing panel's recommendation and recommended disbarment.

The issue presented on review is whether the respon- dent's act of paying a police officer for allegedly truthful testimony in a criminal case which the respondent was defending constitutes misconduct which justifies disbar- ment.

The complaint filed by the Administrator specifically alleged that Kien, while defending a client on charges of unlawful possession of a weapon and related offenses, paid $50 to a testifying police officer immediately after a hearing on the motion to suppress the weapon. Respon- dent's client, Autrey Coleman, had been stopped in his car by police for a traffic offense. During the course of the arrest, Coleman became abusive and Officer Argyrakis opened the passenger door and found a gun inside the car. At the hearing, the key issue was whether Officer Argyrakis had observed the gun in plain view or had only found it pursuant to a search.

On November 15, 1972, Officer Argyrakis went to

court to testify for the prosecution against Coleman. When he arrived he was met by an attorney (not Kien) who represented Coleman. Prior to the case being called, Officer Argyrakis and Coleman's attorney had a conversation in the corridor. The attorney for the Disciplinary Commission attempted to have the officer testify as to that conversation in order to show "the reasonableness of what the officer subsequently did and what subsequently occurred." However, the chairman of the hearing panel sustained the objection to this testimony.

Coleman's case was again set for hearing on March 13, 1973. Prior to that date, Argyrakis had met with an assistant State's Attorney and, pursuant to an investigation, was thoroughly searched and fitted with a recording device. At that time neither Argyrakis nor his superiors knew that Kien represented Coleman. Immediately before the hearing, Kien and Officer Argyrakis went out into the corridor outside the courtroom and had a conversation as to where and how the weapon was found. There is a dispute as to the content of this conversation. The respondent's version is as follows:

"KIEN: Can we take care of this today?

ARGYRAKIS: Yes.

KIEN: You stopped this guy and gave him a traffic ticket and you got him out of the car and you searched the car and found the gun underneath the seat?

ARGYRAKIS: No, I found the gun in open view.

KIEN: Is that in your report?

ARGYRAKIS: No, that is not in my report.

KIEN: What is in your report?

ARGYRAKIS: A search of the car revealed a gun.

KIEN: Good. You got him, you stopped him for a traffic violation, you searched the car, and you looked underneath the seat and found the gun.

ARGYRAKIS: The gun was in open view.

KIEN: Just a second. My client told me you gave him a traffic ticket, you stopped the car, you got him out of the car, you searched the car, and that you found the

gun underneath the seat. What is going on?

ARGYRAKIS: I can find the gun wherever I want.

KIEN: What does that mean?

ARGYRAKIS: You get what you pay for.

KIEN: I just want the truth.

ARGYRAKIS: You got to pay for the truth.

KIEN: I don't like it, but there is nothing else I can do.

ARGYRAKIS: What's the case worth?

KIEN: Fifty dollars.

ARGYRAKIS: Half a hundred?

KIEN: Fifty, yeah.

ARGYRAKIS: Where are you going to meet me?

KIEN: I will meet you in the washroom."

Officer Argyrakis' version of the conversation differs and is as follows:

"He said, 'Well, I got this guy here, this case here.' He said, 'Can we take care of it today?' And I said, 'Yes.'

He said, 'Well, you got the guy for a traffic violation.' Well, he said, 'You didn't want to talk to my partner.' I said, 'I don't know your partner.' He said, 'You know me, don't you?' And, he asked, 'Can we take care of it today?'

And, he says, 'You got the guy out of the car for a traffic violation, and you searched the car, and found the gun under the seat.' I said, 'Yes, but in open view.' He said, 'Do you have that in your report?' I said, 'No, I have "a search".' He says, 'Good.' And, he said, 'Just to say you conducted a search.' I said, 'O.K. What are we talking about?' And he said, 'Half a hundred.' I said, '$50?' And he said, 'Yes, $50. I will meet you over here about ten minutes after the case is over.' I said, 'O.K.' and I went inside."

At the hearing on the motion, Officer Argyrakis testified on direct examination by Kien that he had gone into the car and found the weapon inside. On cross-examination by the assistant State's Attorney, Argyrakis stated that he had found the gun under the seat. The motion to suppress was granted. (At the disciplinary hearing, Officer Argyrakis testified that he had found the gun under the seat but it was in plain view.) Kien then met

Argyrakis in the lavatory across the hall and paid him $50, whereupon he was arrested by Sergeant DeLisa, who was also assisting in the investigation.

On cross-examination at the disciplinary hearing Officer Argyrakis stated that when he had met with the assistant State's Attorney prior to his court appearance on March 13 the following conversation took place between him and the assistant State's Attorney:

> "He said, 'Do what the lawyer tells you to do.' I said, 'What if he tells me to lie under oath, then I will be in trouble.' He said, 'No, do whatever he tells you to do even to the point of perjuring yourself.' He didn't tell me to, he said, 'Do whatever the lawyer tells you to do even to the point of perjuring yourself. You won't be in any trouble.' I said, 'O.K.' "

Respondent contends that his payment to Officer Argyrakis was necessary to ensure that Argyrakis told the truth at the hearing and to protect his client from Argyrakis' "extortion tactics." Respondent admits that his act is not to be condoned. He asserts, however, that his misconduct was not of such a degree as to bring about a miscarriage of justice or strike "at the fabric of our judicial system." He contends that he was only paying the officer to tell the truth. Respondent thus urges that disbarment is too severe a penalty, considering his prior good record, his reputation in the legal community, the single act of misconduct, the absence of personal benefit, and the fact that payment was made for the truth under extortionate circumstances. The respondent asks that we adopt the recommendation of the Hearing Board, and suspend him for 30 days.

The case of *In re Howard* (1977), 69 Ill. 2d 343, which we recently decided, resembles the case at bar, the facts and the issues being strikingly similar. In that case, a defense attorney paid the arresting officer $50 on two occasions to testify "to the truth" as listed on his report. He also made several remarks which implied that he

was going to·improperly influence both the prosecutor and the judge. In that case, we said:

> "Whether it was to influence his testimony to be truthful or otherwise, such acts have the clear appearance of impropriety, bring law officers, the legal profession, and the court into disrepute, and hinder the administration of justice. ***
>
> * * *
>
> *** The damage that would immediately accrue to our system of justice, should it be acceptable to pay for truthful testimony, is manifest." 69 Ill. 2d 343, 351, 353.

We do not find persuasive respondent's argument that payment for "truthful" testimony is less harmful to our judicial system than is payment for false testimony or fabrication of evidence. The Review Board stated in its report in this case: "A lawyer who engages in the compensation of a witness to influence testimony, *however rationalized*, has undertaken a course of conduct which is inconsistent with the most fundamental principles of the legal profession." (Emphasis in report.) Any payment by a defense lawyer to an arresting policeman must be viewed with suspicion. Since the defendant and the arresting officer are often the only witnesses to the arrest or search, a policeman would be encouraged to change the "truth" if the lawyer is permitted to pay him for what the lawyer believes is the truth. It is realistic to assume that defense lawyers will not pay policemen for "truth" which does not favor their clients. Those policemen who are less resistant to corrupting influences will soon discover how to change the truth to their economic benefit. It is axiomatic, however, that such corruptible police officers could not thrive but for the existence of lawyers willing to corrupt them.

Although we condemned the practice of such payments in *In re Howard*, for emphasis we reiterate that we will not tolerate payment of any sum of money by an

attorney to witnesses for the opposition to secure or influence testimony, whether it be for the purpose of securing truthful testimony or otherwise.

As we said in *In re Howard,* however, "The discipline to be imposed in each case must be judged individually, based on the specific circumstances and conduct involved." (69 Ill. 2d 343, 354.) While we find the respondent guilty of misconduct, we have considered the respondent's prior record, the lack of direct personal gain, the fact that this is a single act of misconduct, and the circumstances of his act, all as factors in mitigation. In addition, we note that at the hearing it was stipulated that several well-known attorneys, including a judge and a prosecutor, would have testified as to respondent's prior reputation for honesty and integrity. Also, although we have previously indicated that we severely condemn the respondent for paying money to the officer, we view his ethical aberration as less flagrant than that exhibited in *In re Howard.* In the case now before us the conduct of the assistant State's Attorney and the officer, although not amounting to entrapment, can be viewed at least to be tacit encouragement to the respondent to enter into the condemned transaction.

Accordingly, it is the order of this court that the respondent be suspended from the practice of law for 18 months. However, the record indicates that the respondent had removed himself from the practice of law for at least 6 months. Accordingly, this 6-month period will be credited against the 18-month suspension.

*Respondent suspended.*

MR. JUSTICE CLARK, concurring in part and dissenting in part:

I agree that the conduct of the respondent is to be condemned. He should have immediately reported this

attempted "shakedown" rather than participating in it. While I recognize that the pressures upon this unfortunate young man to go along with the scheme were enormous, the public and this court have a right to expect that attorneys will resist such pressures. I therefore concur in the court's judgment insofar as it holds that the respondent has been guilty of misconduct which merits the imposition of a disciplinary sanction.

I part company with my brothers, however, with regard to the particular sanction imposed in this case.

My objections are twofold: First, the sanction imposed in this case is difficult to reconcile with the sanction we imposed in a recent case, *In re Cook* (1977), 67 Ill. 2d 26. Second, because the length of the suspension imposed in this case is not based upon an articulated standard, it provides insufficient guidance for our selection of sanctions in future cases. Without such guidance, the sanctions imposed in future disciplinary cases are likely to remain unpredictable and lack the appearance of fairness.

In *Cook* we suspended the respondent for "3 years," but because we mandated that the period of suspension begin almost two years prior to the date of the opinion, the respondent was in effect only suspended for one year and four months. In the instant case, the effective period of suspension is only four months shorter than that in *Cook*, but the misdeeds of this respondent pale in comparison to those in *Cook*. Cook was an attorney of considerable skill and prominence, much of which was attained in this jurisdiction. He had, largely as a result of that skill and prominence, risen to the chairmanship of the United States Securities Exchange Commission. His was a position of great public trust, for he headed the agency responsible for maintaining public confidence in the integrity of our capital markets. The financial security of millions of Americans could be affected by his actions and decisions. Thus, because of his position's high visibility and

responsibility, his actions had a critical impact upon public confidence in the administration of justice and in the integrity of our profession, and were a particularly fit subject for review in an attorney disciplinary proceeding. *Cf. In re Alschuler* (1944), 388 Ill. 492, 503; *In re Di Bella* (1974), 58 Ill. 2d 5, 8.

Cook abused his public trust by using his high office to participate in a conspiracy to obstruct justice. In furtherance of that conspiracy he knowingly gave false testimony to a grand jury, apparently to protect the partisan political interests of the man who appointed him.

In the instant case, the respondent, as an attorney, also held a position of public trust, but certainly one of lesser visibility and responsibility than Cook's. In the instant case, the respondent also violated his public trust, but to a lesser degree than did Cook. Here, a police officer threatened to prejudice the constitutionally protected interests of the respondent's client by giving false testimony unless paid to tell the truth. There is evidence that an assistant State's Attorney also was a party to the attempted extortion. Faced with this situation, in what must have been a moment of not inconsiderable panic in this attorney's young professional life, he made the wrong decision and failed to live up to the trust placed in him. But unlike Cook, he did not knowingly try to perpetrate a fraud upon the court; and his acquittal on charges of bribery and subornation of perjury also is not without significance. Why, therefore, is his punishment almost as severe as that in *Cook*? We noted Cook's skill and reputation as factors in mitigation—yet are these not aggravating factors—or are prominent attorneys to be dealt with more leniently than less prominent ones? I confess that I find few answers to these questions in most of the recent decisions of this court, which brings me to my second point.

Disciplinary cases bring us face to face with the

dilemma which confronts our brothers on the trial bench each time they are called upon to pronounce sentence upon a defendant: There is a need to express society's outrage at the offense, often tempered by natural human compassion for the offender and his family. If sentences are to be other than random, they must be based upon more than the unparticularized interplay of these two considerations. In the field of criminal law, the legislature can and does from time to time attempt to provide more specific standards. (See, *e.g.*, section 5—1—1 *et seq.* of the Unified Code of Corrections (Ill. Rev. Stat. 1975, ch. 38, par. 1005—1—1 *et seq.*). See also Public Act 80—1099.) In disciplinary matters, however, this court has held that its power is exclusive. (See *People ex rel. Chicago Bar Association v. Goodman* (1937), 366 Ill. 346; *In re Day* (1899), 181 Ill. 73.) If there are to be standards, therefore, they must come from this court. The sparse language of our rules is, without further analysis, singularly unhelpful. *E.g.*, "conduct *** which tends to defeat the administration of justice or to bring the courts or the legal profession into disrepute" (58 Ill. 2d R. 752(a)). (See Swett, *Illinois Attorney Discipline,* 26 De Paul L. Rev. 325, 343-44 (1977).) We have not expressly adopted the Code of Professional Responsibility of the American Bar Association (though compliance therewith is a "safe guide"). (See *In re Krasner* (1965), 32 Ill. 2d 121, 129.) That leaves the opinions of this court as the most important key to the law of legal ethics in Illinois. But even here the court has held that the doctrine of *stare decisis* does not apply to the selection of sanctions. (*In re Nesselson* (1966), 35 Ill. 2d 454, 461.) Thus, the degree of consistency for which the court strives (*In re Andros* (1976), 64 Ill. 2d 419, 425) is unlikely to be achieved. Rather, our continued adherence to a case-by-case "totality of the circumstances" approach will leave our standards opaque and our sanctions unpredictable. Such unpredictability will require every case to

be brought before us for review.

Accordingly, we must articulate the standards which we apply in imposing sanctions in disciplinary cases; if not by rule, then by adjudication. Standards can and should be derived from the underlying purposes of our disciplinary process, which are to safeguard the public, maintain the integrity of the profession, and protect the administration of justice from reproach. (See, *e.g., In re Sherre* (1977), 68 Ill. 2d 56, 62; *In re Smith* (1976), 63 Ill. 2d 250, 256; *In re Di Bella* (1974), 58 Ill. 2d 5, 8; *In re Gartland* (1970), 47 Ill. 2d 177, 183.) These purposes can be further refined. For example, in context, the "safeguarding of the public" apparently refers to harm perpetrated against individuals, and means that we will impose sanctions upon those who use the office of attorney to harm their clients or other persons. The purposes of sanctions for such misconduct should be (1) to remove from practice those who would use their office to harm their clients and other persons; (2) by reflecting the seriousness of the offense, to communicate to the respondent and to other members of the bar the standard of care expected of them; and (3) to reassure the public that they may seek legal assistance without fear of being defrauded or otherwise ill-served. Thus, when an attorney's actual intent to defraud can be shown or inferred, disbarment is necessary for all three of the above reasons, because the attorney simply no longer can be trusted. When a lack of care is shown, however, the imposition of a sanction less than disbarment is likely to assure that greater care is exercised by the attorney in the future. (*Cf.* generally, *In re Taylor* (1977), 66 Ill. 2d 567, 571.) The length of suspension therefore should be closely tied to the harm caused or unreasonably risked because of the lack of care. Any suspension longer than six months is likely to have an extremely harsh effect upon the attorney's personal and professional life, and therefore only should be imposed where the attorney's misconduct

was seriously prejudicial or harmful to the pecuniary, penal, or privacy interests of his client or another member of the public.

Factors considered in mitigation of the sanction imposed in such cases should be limited to those which mitigate the seriousness of the breach of duty, and should not include considerations such as the good character and community involvement of the respondent, qualities which are to be expected of all attorneys.

The "integrity of the profession" and the "protection of the administration of justice from reproach" deal not as much with the protection of individual members of the public, as with the general public interest. Our system of justice requires public confidence and support if it is to survive as an effective forum for the resolution of private disputes and the protection of public and private rights. Attorneys who defraud, obstruct, or corrupt that system, or who appear to do so, undermine such public confidence. Yet we also must be careful not to chill a vigorous advocate from timely presenting any defensible argument on behalf of his client. (See generally Canon 7 of the ABA Code of Professional Responsibility.) Nor should we be too quick to rely upon "the appearance of impropriety" as a substitute for substantial circumstantial evidence of misconduct.

When misconduct is clearly shown, however, it should be punished in accordance with the degrees to which it undermines the integrity of the profession, the administration of justice, and public confidence therein. Thus, as suggested earlier, prominence in the profession and public offices involving the skills and training of an attorney summon an even higher standard of care than does the office of attorney and counselor itself, because the actions of lawyers in such positions have a crucial impact upon public confidence in the rule of law.

Also, deliberate misstatements before a tribunal

normally should lead to disbarment, for, once again, the attorney no longer can be trusted as an officer of the court. Interference of a less substantial nature, such as unjustifiable delays, improper conduct before the court, and other offenses, normally should call for sanctions less than the complete termination of a professional career. Thus, in such cases, disbarment, or even a three-year suspension, normally should not be imposed. (See *In re Fisher* (1958), 15 Ill. 2d 139, 154-55.) And, as stated earler, suspensions longer than six months are likely to have an extremely harsh effect upon an attorney's professional and personal life, and therefore should be reserved for cases where the misconduct either caused or unreasonably risked substantial prejudice to the resolution of a particular matter within the jurisdiction of a particular tribunal.

Conviction of a crime may call for disbarment if its commission reflects upon the integrity of the profession and suggests that the attorney is likely to use his office to harm either individuals ("the public") or the public interest ("the administration of justice"). (See 65 Ill. 2d R. 761.) Crimes involving the intent to defraud normally fall into this category. (See, *e.g., In re Sherre* (1977), 68 Ill. 2d 56.) Later cooperation with the prosecution of one's coconspirators in such crimes is not probative of the respondent's initial intent to defraud if it is part of a "plea bargain," and should not be considered in mitigation of the sanction imposed for the misconduct.

The foregoing standards are not intended to be exhaustive. Rather, they are intended to be suggestive of the approach the court should be taking in dealing with these difficult issues, so that we begin to adopt a more consistent stance on sanctions for the misconduct of attorneys. The safeguarding of the public, the maintenance of the integrity of our profession, and the protection of the administration of justice against reproach will be better

served thereby, because such an approach will more clearly communicate to both the public and the profession the standard of conduct expected of persons licensed to practice law in this State.

MR. JUSTICE DOOLEY, dissenting:

Some uncontradicted facts should be put in bold relief to understand our position.

On oral argument it was admitted that no prior conduct of respondent prompted "wiring" the police officer. It was initiated by the activity of the assistant State's Attorney who, according to the police officer, had advised him to do everything necessary, including committing perjury, to aid the defendant in the criminal case.

Respondent admittedly had nothing to do with the assistant State's Attorney's conduct. Moreover, respondent was tried and acquitted of the charge of bribing an officer and subornation of perjury.

The police officer's testimony before the disciplinary commission, as the majority opinion points out (69 Ill. 2d at 359), was contrary to his sworn evidence at the trial of respondent's client in the criminal case on the crucial question, the location of the gun.

In view of this fact, we are, in my opinion, confined to respondent's testimony of this incident as it is set forth in the majority opinion.

Respondent was not impeached in any method, although his conversation with the police officer had been recorded. Those who saw and heard him apparently believed him. I refer to the Honorable Louis Garippo, an experienced and able judge who heard respondent's criminal trial without a jury, and the hearing panel of the Attorney Registration and Disciplinary Commission. Their opportunity to judge credibility was far superior to ours, since we are confined to the lifeless record.

More than that, the different version of Officer

Argyrakis is that of an admitted perjurer. Either his testimony in the criminal court case of respondent's client or his testimony before the disciplinary commission was false; both could not be true.

As this court observed in *In re Donaghy* (1948), 402 Ill. 120, 134-35:

> "The punishment to be inflicted by disbarment of an attorney is the destruction of his professional life. Only clear and satisfactory proof can justify a decision from which would flow consequences of such a grave nature. (*People ex rel. Deneen v. Matthews*, 217 Ill. 94.) To justify disbarment the case made must be free from doubt, not only as to the act charged but as to the motive with which it was done. (*People ex rel. Chicago Bar Ass'n v. Ader*, 263 Ill. 319.) *** The evidence of guilt of the accused with reference to the transactions charged must be clear, and it is not sufficient that the evidence shows a state of facts not entirely creditable to the respondent and the other parties to the transaction."

The requisites that there be "clear and satisfactory proof" and that "the evidence of the guilt of the accused *** must be clear" apply equally when the penalty is suspension. Here the evidence fails to meet either test.

We must evaluate this bizarre tableau in the light of reality. Respondent asked the first question any lawyer puts to an investigating officer: "What is in your report?" Argyrakis told him a search of the car revealed a gun. He makes the statement that the gun was in open view. Respondent stated what his client told him and queried: "What is going on?" The police officer retorted: "I can find the gun wherever I want." Respondent said: "I just want the truth." The wired officer brought up the question of money.

The police officer, it must be remembered, was

playing a diabolical role. He portrayed himself to respondent as one whose concept of the truth is dependent upon compensation. The officer's predetermined role was to obtain some incriminating statement from respondent. No doubt he was impressive. Respondent had these alternatives: He could impeach the officer with his report if he testified contrary to it. However, such impeachment would only go to his credibility. (*People v. Collins* (1971), 49 Ill. 2d 179, 194-98; *People v. McKee* (1968), 39 Ill. 2d 265, 270; *Smith v. Pelz* (1943), 384 Ill. 446, 451-52.) The report would not be original evidence. (*People v. Gant* (1974), 58 Ill. 2d 178, 183; *People v. Collins* (1971), 49 Ill. 2d 179, 198.) A motion to suppress could well be denied, although the officer's testimony was false, since the question before the court would be the believability of the wittnesses' testimony as a whole. (See *People v. McCray* (1965), 33 Ill. 2d 66, 71; *People v. Carbona* (1975), 27 Ill. App. 3d 988, 1001; *People v. Hampton* (1973), 14 Ill. App. 3d 427, 435.) Or respondent, after laying a foundation for the admissibility of the corridor conversation, could himself take the stand and impeach the officer. Such a practice, however, has long been frowned upon. *Finley v. Felter* (1949), 403 Ill. 372, 379; *Biskupski v. Jaroszewski* (1947), 398 Ill. 287, 295.

Respondent had to make a judgment. While it could have been a better one, it certainly had not that magnitude of wrong the majority would attribute to it.

According to the majority, payment for truthful evidence is no different than payment for false or fabricated evidence. Specifically, it stated:

> "We do not find persuasive respondent's argument that payment for 'truthful' testimony is less harmful to our judicial system than is payment for false testimony or fabrication of evidence." (69 Ill. 2d at 361.)

Payment for false testimony or fabrication of evidence,

and payment for the truth are poles apart. The evil is not in the payment as the majority would suggest. It is in whether the testimony itself is truthful or false. Payment for false testimony or fabrication of evidence is a crime under our laws. (Ill. Rev. Stat. 1975, ch. 38, par. 32—3.) It is subornation of perjury. More than that, it violates the basic moral code of "Thou shall not bear false witness against thy neighbor," the eighth commandment of the decalogue. Nothing in the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 1—1 *et seq.*) makes it unlawful to pay for truthful testimony, nor is there anything in the moral code precluding such conduct.

This young man has already been heavily penalized. Following his arrest, he lost considerable weight, received psychiatric treatment, and voluntarily stopped the practice of law. He did not return to his work until several months following his acquittal on the criminal charges. At the time of the disciplinary hearing, he was still under psychiatric care.

More than that, we have dealt proportionately lesser penalties in more grievous incidents. The chairman of the Securities and Exchange Commission, who gave false testimony before a Federal grand jury and before a Senate subcommittee on appropriations on two occasions, was suspended for an effective period of only one year and four months. (*In re Cook* (1977), 67 Ill. 2d 26.) In *In re Spencer* (1977), 68 Ill. 2d 496, the respondent represented an executor in probate proceedings. Without the executor's knowledge or consent and while still representing him, the respondent accepted a retainer fee and entered into a contingent fee contract to represent a beneficiary in a suit to contest the will. The respondent filed a petition to remove the executor and signed the beneficiary's name without her consent. For this misconduct, he was censured. Reference to these cases is made solely to point out our heavy-handedness here, not that we are without

standards.

We must be mindful of Plato's admonition: "It is better to suffer an injustice than to commit one." The penalty imposed here offends the reasonable man's sense of justice which, like great works of art, defies definition.

As Mr. Justice Clark aptly points out in his opinion, there is a disparity of sanctions in our disciplinary procedure. Ever present in the administration of justice has been this problem of disparity of penalty. There are two conflicting forces: that of the public for protection, and that of the lawyer for evenhanded treatment. Our duty is to accomodate both. Justice itself is the accomodation of conflicting interests.

Many years ago Learned Hand concluded: "I don't believe there is any royal road to attain such accomodations concretely." We must be ever aware that we deal in problems with a human, not a mathematical equation. Our problem is judicial, not legislative.

We must avoid standards so rigid that the needs of situations as they evolve cannot be met. Illustrative of what we mean is a series of decisions in which this court made conviction of a crime involving moral turpitude conclusive evidence of an attorney's guilt and a ground for disbarment. (*In re Eaton* (1958), 14 Ill. 2d 338; *In re Teitelbaum* (1958), 13 Ill. 2d 586; *In re Needham* (1936), 364 Ill. 65.) Violation of the Internal Revenue Code (Int. Rev. Code of 1954, sec. 145(b)) was a crime involving moral turpitude. (*In re Teitelbaum* (1958), 13 Ill. 2d 586.) Yet in *In re Greenberg* (1961), 21 Ill. 2d 170, and *In re Crane* (1961), 23 Ill. 2d 398, while the court recited the rule, it was compelled to retreat from its rigidity. In those cases the nature of the criminal conduct was considered to determine the appropriate discipline to be accorded. *In re Walker* (1977), 67 Ill. 2d 48, manifests that there has been a complete erosion of this once-prevalent standard.

We have an abundance of standards. The problem is in

their application. As Cassius said: "The fault, dear Brutus, is not in our stars, but in ourselves ***."

I would dismiss the charge against respondent here.