THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. STEPHANIE BONDS, Defendant-Appellant.

First District (5th Division) No. 1—07—1629

Opinion filed April 24, 2009.—Rehearing denied June 16, 2009.

Patricia Unsinn and Ann B. McLennan, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (James E. Fitzgerald, Rimas F. Cernius, and Jennifer Chow, Assistant State's Attorneys, of counsel), for the People.

JUSTICE TOOMIN delivered the opinion of the court:

In the present appeal we encounter the contentions of the defendant that the rule barring hearsay testimony was improperly invoked so as to preclude her defense at trial. Following a jury trial, Stephanie Bonds was convicted of first degree murder of her 10-week-old son and sentenced to a term of 45 years' imprisonment. On appeal, she contends that the trial court's erroneous evidentiary rulings precluded her from offering prior inconsistent statements of her own witness as impeachment and as declarations against penal interest. She also requests that the mittimus be corrected to reflect only one conviction for first degree murder. No challenge is asserted to the sufficiency of the evidence. For the following reasons, we affirm and order the mittimus corrected.

## BACKGROUND

On June 1, 2005, Nyshon Johnson, defendant's 10-week-old son, suffered injuries ultimately causing his death. The following day, defendant confessed to inflicting the injuries in a videotaped statement. This statement was played for the jury at trial. Defendant claimed the initial injuries occurred when she tripped on a toy while

carrying Nyshon through their apartment. The toy was left on the floor by her then-six-year-old son Chino. Nyshon then began to cry. As she carried Nyshon and cautioned him to be quiet, he hit his head on a wall between the two rooms.

Nyshon was inconsolable and continued to cry despite defendant's pleas for him to be quiet. Defendant sat down on the couch with Nyshon on her lap and began to shake him "hard" using her hands and one leg and began hitting him in the head with her hand. The crying continued and defendant took Nyshon with both hands and threw him forcefully to the floor, which was covered with an unpadded and worn carpet. The back of Nyshon's head impacted the floor and he cried more vocally.

Defendant retrieved Nyshon from the floor and returned to the couch where she shook him again and begged him to stop crying. It continued and she, once more, threw him to the floor. The side of his head again struck the floor. The tone of the cries changed, Nyshon continued to move his limbs, and the crying continued. Defendant then grabbed one of his arms and one of his legs and "flung" Nyshon onto the couch, where he struck the wooden portion of the couch with his head. On examining Nyshon, defendant observed that his eyes "were rolling around." Nyshon then closed his eyes and stopped crying. She then walked outside.

Defendant's sister Stacy discovered Nyshon and brought him outside and gave him to defendant, who shook him but received no response. Nyshon was not breathing. A neighbor who heard the commotion came over and assisted defendant in performing cardiopulmonary resuscitation (CPR) on Nyshon. Defendant never told anyone on the scene what she had done.

The fire department and then paramedics arrived to treat and transport Nyshon to the hospital. Defendant rode along to West Suburban Hospital, where Nyshon was initially treated. He was later transported to Loyola University Medical Center by ambulance. Defendant never informed any of the paramedics or medical personnel what she did to Nyshon. While she was at Loyola, defendant called her sister and father to tell them to clean up the house before the Department of Children and Family Services (DCFS) came. When defendant later spoke with detectives, she lied to them about what she had done to Nyshon.

Assistant Medical Examiner Wendy Lavezzi conducted the autopsy of Nyshon. She was apprised of some of the facts of the case prior to conducting the postmortem, but did not recall if she was aware of defendant's confession or if she learned of its contents shortly thereafter. She recalled being told Nyshon had been thrown.

The external examination revealed indications of Nyshon's hospitalization as well as several areas of bruising on the outside of his forehead, outside of his eye, and above his eyebrow. These bruises appeared to have been recently formed. There was bruising on his legs and one of his feet, though it was not clear whether they were due to traumatic injury, treatment, or organ failure while he was on the respirator. No cuts or lacerations were observed.

Dr. Lavezzi also performed an internal examination, particularly of Nyshon's cranial cavity and brain. Diffuse hemorrhage was found "all over the top of the head" in the form of a subgaleal hemorrhage, which typically occurs at the focal point directly beneath the point of external injury. Signs of impacts were present on either side of his head. The amount of bleeding seen could have been worsened by the treatment and resulting bleeding disorder.

The left side of Nyshon's skull sustained a comminuted or branching fracture of the parietal portion of the cranium. The primary branch was 4 inches long with two downward branches measuring 2½ inches. Similar fractures were observed on the right side. This indicated at least one impact on either side of the skull, but it was more likely that there were multiple impacts on each side. Fractures of this sort are not typical in children Nyshon's age due to the pliability of infant skulls. The nature of the fractures indicated that they were caused by "significant, directed force." There was also diffuse subdural hemorrhaging. The brain was extensively swollen, from the injuries and was likely exacerbated by the treatment at the hospital, including the time on the respirator. This swelling was evident in the external profile photograph depicting Nyshon's misshapen head. There was also hemorrhage around the optic nerves due to the impacts.

Dr. Lavezzi opined that the injuries were caused by blunt force trauma. The injuries were consistent with Nyshon's head hitting a wall. Of the approximately 15 autopsies she had conducted on infants who suffered blunt force trauma to the head, Nyshon's injuries were the worst she had ever seen. The injuries were not consistent with Nyshon having been dropped or accidentally struck. Instead, they were indicative of multiple instances of directed blunt force trauma to the head, specifically being struck against a large flat object several times. Likewise, Nyshon's presentation was consistent with more than one blow to the head, rather than a single blow or stomp to the head. Injuries to one side of the head can cause reciprocal injuries on the other side of the brain or tissue, but not to the skull itself.

The cause of Nyshon's death was "craniocerebral injuries due to blunt trauma," regardless of any other information or police reports. Likewise, the manner of death was homicide. Dr. Lavezzi opined that

the injuries would not have been inflicted by a child because of the degree of force required to inflict these injuries. However, "anyone the size of an adult could inflict these injuries."

The State presented additional evidence not germane to the issues raised on appeal. Thereafter, the State rested its case-in-chief.

Defendant took the stand and testified that she did not tell anyone what she had done until she gave her statement. She did so after voluntarily accompanying detectives to the station. She initially denied knowing how Nyshon was injured, but later acknowledged that she had lied.

Defendant testified that she did not hurt Nyshon and that she was never alone with him during the time period he was injured. Instead, she maintained that she made the videotaped statement only after she was threatened with the loss of her children and her sister to DCFS custody. She was willing to say anything to keep that from happening. The detective told her what happened to Nyshon, what she should say in her statement, and that it would look good to the jury to give a statement.

Defendant's son, Chino, who was eight years old at the time of trial and six years old at the time of the occurrence, was called by the defense. On initially being sworn by the court clerk, Chino indicated that he did not understand what was asked of him. The trial judge asked him, "All right, do you solemnly swear that the testimony you're going to give here today will be the truth, the whole truth, and nothing but the truth so help you God[?]" Chino responded nonverbally and was told he had to do so aloud and then said, "Yes." When asked if he understood what the judge said to him, he again responded nonverbally. He ultimately stated that he did understand.

Chino remembered his brother going to the hospital, but lacked any other way to remember the day of the events. He knew he went to school that day, was picked up by defendant, taken home, did his homework, and then went outside. While he was inside the house with Nyshon, he did not recall picking him up or dropping him. Likewise, Chino did not recall telling his aunt, Salina, he was sorry for hurting Nyshon and how Nyshon slipped out of his hands. While he remembered telling his maternal grandmother that he picked up Nyshon because he was crying, he did not recall telling her he dropped Nyshon. Chino also did not recall meeting with a woman from DCFS named Karen Wilson or telling anyone from DCFS that he "dropped Nyshon on Friday and Nyshon is now in heaven."

Chino admitted to having lied and told varying stories about what happened to his brother and denied being told to lie by any grown-ups. When asked to tell the "really, really truth," Chino said he spent

the entire day outside riding his bike. On further examination, Chino said he went home to start his homework right after school and that he had not been on his bike all day long. Again, no adult told him what to say.

After Chino testified, defense counsel advised the court of his intent to call three additional witnesses to introduce Chino's prior inconsistent statements thereby impeaching his trial testimony. The trial judge observed that Chino appeared "very youthful" and that "the demeanor of the statements of Chino Johnson first even taking the oath [sic] the Court is not satisfied that he understood or fully understands the difference between a truth [sic] and a lie or the moral obligation to testify truthfully." Neither side ever challenged Chino's competency to testify and the court did not perceive it was its function to do so. The trial judge indicated that his observations supported his belief that Chino "did not have any ability to recognize his obligation as the oath requires to testify truthfully in this case."

When faced with the defense request to call witnesses to impeach its own witness, the trial judge observed that it would have to be limited to his credibility. In turn, the judge expressed uncertainty as to why Chino was called and what was to be gained by impeaching his credibility. Furthermore, this was clearly a situation where "Illinois Pattern Jury Instruction 3.11" would come into play and would limit the consideration of any prior inconsistent statement to the issue of credibility and could not be considered substantively. To do so would be legally improper. As such, he asked the defense what was accomplished through Chino's testimony and what the defense perceived would be accomplished by permitting impeachment.

Defense counsel responded that Chino was called in hopes that he would "tell what we believed to be the truth." The truth, according to defense counsel, was "That he actually did drop the child." Defense counsel agreed with the trial judge's assessment of Chino's credibility, but the key point for the defense was Chino's credibility stemming from his denial that he actually dropped Nyshon.

According to the trial judge, it was clear that the purpose of calling Chino was to obtain an admission that he dropped or otherwise harmed Nyshon. However, Chino denied doing so and the defense was now planning to call three witnesses that would say Chino told them various things acknowledging that he somehow injured Nyshon. The judge then surmised that this purported impeachment evidence was actually going to be offered substantively, for the truth of the alleged statements. Defense counsel claimed the testimony was supportive of the theory that they did not know what happened to Nyshon where Chino and several other people were potentially alone with him. Yet,

rather incongruously they were not planning to argue that Chino "did it."

In sum, the judge observed that it was still unclear what the defense was trying to accomplish by the impeachment other than that he was being truthful now or was lying now based on the prior statements. Otherwise, the trial judge did not see that Chino's testimony contributed to the proceedings. Perceiving that the defense was attempting to treat these statements substantively, the judge prophylactically forbade the parties from improperly arguing Chino's prior inconsistent statements as substantive evidence.

The State indicated they would be making a motion *in limine* as to the contemplated testimony on the basis of relevance. The trial judge said he saw no legitimate purpose for calling these witnesses. Defense counsel responded that the State's motion was an unfair tactic that would put him in a "very difficult position" with the jury since he set up the impeachment of Chino.

The trial judge indicated that the defense could argue that defendant was not present when the injuries were inflicted, if they thought Chino was truthful on that point. However, this fact did not open the door to impeachment of Chino to "subtly" say that Chino is the one who did it. Otherwise, the proposed impeachment did not appear to be about Chino's credibility, but rather was to place his inculpatory statements before the jury.

The State's motion *in limine* was granted with the court reasoning the testimony would "unduly and unfairly cloud the legitimate issues before this jury" and the out-of-court statements could not possibly be used as substantive evidence. However, the parties were permitted to argue whether to believe Chino's testimony that defendant was not present when Nyshon was injured.

The trial judge also raised and discussed, at length, whether Chino's statements would qualify as an exception to hearsay as a declaration or statement against penal interest. He interpreted relevant case law and applied it to the facts in the case at bar, concluding that Chino's statements to others lacked "any indicia of trustworthiness." Hence, none of the proffered statements made by Chino to others were properly admissible under this exception to the hearsay rule.

The defense then rested and the parties delivered their closing arguments. The jury returned a verdict of guilty of first degree murder. This appeal followed.

## ANALYSIS

Evidentiary rulings are left to the sound discretion of the trial court and ought not be reversed barring a clear showing the trial

court abused its discretion. *People v. Enis*, 139 Ill. 2d 264, 281, 564 N.E.2d 1155, 1162 (1990). This is equally true for rulings on motions *in limine*. *People v. Harvey*, 211 Ill. 2d 368, 392, 813 N.E.2d 181, 196 (2004). Trial courts must determine whether proffered evidence "fairly tends to prove or disprove the offense charged and whether that evidence is relevant in that it tends to make the question of guilt more or less probable." *People v. Wheeler*, 226 Ill. 2d 92, 132, 871 N.E.2d 728, 750 (2007). Trial courts can reject offered evidence as irrelevant for lacking probative value due to its remote nature, uncertainty, or potential for unfair prejudice. *Harvey*, 211 Ill. 2d at 392, 813 N.E.2d at 196.

Evidentiary rulings will only be found to constitute abuses of discretion when they are "arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Caffey*, 205 Ill. 2d 52, 89, 792 N.E.2d 1163, 1188 (2001). Evidence is deemed admissible where its probative value outweighs any prejudicial effect. *People v. Monroe*, 66 Ill. 2d 317, 323, 362 N.E.2d 295, 297 (1977). On review, we are mindful that evidentiary rulings are not made in isolation; instead, they involve the consideration of the facts and circumstances of the case before the court. *Caffey*, 205 Ill. 2d at 89-90, 792 N.E.2d at 1188.

Perfecting the Purported Impeachment of Chino's Testimony

Here, as in *Wheeler*, defendant refers to her right to present a defense as the cornerstone of her appeal. See also *People v. Molsby*, 66 Ill. App. 3d 647, 657, 383 N.E.2d 1336, 1344 (1978). Although we are mindful of the fundamental underpinnings of this claim, we note nonetheless that this right is not limitless; "it is also true that defining the precise limits controlling the admission of such evidence is difficult and if the evidence is too remote in time or too speculative to shed light on the fact to be found, it should be excluded." *Wheeler*, 226 Ill. 2d at 132, 871 N.E.2d at 750. Manifestly, we must remain focused on the relevance of the proffered evidence. See *Wheeler*, 226 Ill. 2d at 132, 871 N.E.2d at 750.

Thus, we observe, as did our supreme court in *People v. McLaurin*:
"The right to offer the testimony of witnesses and to compel their attendance, if necessary, is, in plain terms, the right to present a defense. [Citation.] *** However, more than the mere absence of testimony is necessary to establish a violation of the right to compulsory process that the sixth amendment guarantees. *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867, 73 L. Ed. 2d 1193, 1202, 102 S. Ct. 3440, 3446 (1982). *** The defendant must make at least some plausible showing of how the testimony of the witness would have been both material and favorable to his defense.

*Valenzuela-Bernal*, 458 U.S. at 867, 73 L. Ed. 2d at 1202, 102 S. Ct. at 3446; *People v. Fryer*, 247 Ill. App. 3d 1051, 1064 (1993). Evidence is material when it tends to raise a reasonable doubt of the defendant's guilt. *People v. Sims*, 167 Ill. 2d 483, 507 (1995). The pertinent inquiry with respect to materiality is not whether the evidence might have helped the defense but whether it is reasonably likely that the evidence would have affected the outcome of the case. *Sims*, 167 Ill. 2d at 507; see *Valenzuela-Bernal*, 458 U.S. at 868-69, 73 L. Ed. 2d at 1203-04, 102 S. Ct. at 3447." *People v. McLaurin*, 184 Ill. 2d 58, 88-89, 703 N.E.2d 11, 25-26 (1998).

Yet, concomitantly the rights of confrontation and cross-examination are "not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers v. Mississippi*, 410 U.S. 284, 295, 35 L. Ed. 2d 297, 309, 93 S. Ct. 1038, 1046 (1973).

We likewise discern that Supreme Court Rule 238(a) provides that a witness can be impeached by any party (188 Ill. 2d R. 238(a)) within certain limits:

"[T]o do so, a party must show that the witnesses' testimony has damaged rather than failed to support the position of the impeaching party. *People v. Weaver*, 92 Ill. 2d 545, 563 (1982). It is only when the witness' testimony is more damaging than his complete failure to testify would have been that impeachment is useful. *Weaver*, 92 Ill. 2d at 563-64. The effect of evidence admitted for impeachment is that it tends to (1) discredit the witness (*People v. Cruz*, 162 Ill. 2d 314, 359 (1994)), and (2) cancel the witness' damaging testimony (*Weaver*, 92 Ill. 2d at 563)." *People v. Sims*, 285 Ill. App. 3d 598, 610, 673 N.E.2d 1119, 1127 (1996).

Damaging testimony is that which is actually helpful to the opposing party's case. *People v. Cruz*, 162 Ill. 2d 314, 360, 643 N.E.2d 646, 658 (1994).

In *Weaver*, our supreme court concisely explained the necessity and rationale for allowing impeachment by prior inconsistent statements only under very narrow circumstances:

"A court's witness, or any witness for that matter, cannot be impeached by prior inconsistent statements unless his testimony has damaged, rather than failed to support the position of the impeaching party. The reason for this is simple: No possible reason exists to impeach a witness who has not contradicted any of the impeaching party's evidence, except to bring inadmissible hearsay to the attention of the jury. Impeachment is supposed to cancel out the witness' testimony. It is only when the witness' testimony is more damaging than his complete failure to testify would have been that impeachment is useful. See *People v. Johnson* (1929), 333

Ill. 469; *People v. Chitwood* (1976), 36 Ill. App. 3d 1017; McCormick, Evidence sec. 36 (2d ed. 1972)." *People v. Weaver*, 92 Ill. 2d 545, 563-64, 442 N.E.2d 255, 262-63 (1982).

We are further mindful that there is a potential risk in using prior inconsistent statements as impeachment wherein a jury could consider them as evidence of the truth of the impeaching words. *People v. Gacho*, 122 Ill. 2d 221, 252, 522 N.E.2d 1146, 1161 (1988). The interplay of impeachment and substantive evidence was succinctly described in *People v. Barton*, where the court explained:

"It is black-letter law that a witness's prior inconsistent statement is admissible only to attack his credibility and cannot be admitted as proof of the substance of the statement. [Citation.] The purpose of impeachment is to destroy credibility, not to prove the facts stated in the impeaching statement, and what a witness says out of court and out of the presence of defendant is pure hearsay and incompetent. [Citation.]" *People v. Barton*, 286 Ill. App. 3d 954, 961, 677 N.E.2d 476, 481 (1997).

See also *Cruz*, 162 Ill. 2d at 359, 643 N.E.2d at 657.

Impeachment by prior inconsistent statements similarly presents a problem for juries when called upon to compartmentalize the testimony as regarding credibility, rather than substantively. *Cruz*, 162 Ill. 2d at 364, 643 N.E.2d at 660; see *People v. Paradise*, 30 Ill. 2d 381, 384, 196 N.E.2d 689, 691 (1964) (discussing the challenge to jurors to differentiate between impeachment of credibility and substantive evidence when faced with statements witnesses "will not affirm *** in a public proceeding").

Initially, we must agree with the State's position that Chino's testimony did not damage defendant's case, though it plainly did not support her theory of the case. See *Sims*, 285 Ill. App. 3d at 610, 673 N.E.2d at 1127. The record establishes that there were several people, including Chino, who were alone with Nyshon at some point near the time he was injured. Additionally, Chino testified, in part, that defendant was not in the apartment at the time when Nyshon was hurt. This assertion certainly does not damage defendant's case.

■ Nothing about Chino's testimony, most particularly his denials of having harmed Nyshon, does violence to defendant's theory of an unknown perpetrator or that of accidental injuries. Likewise, the line of questions resulting in Chino's denials may just have easily created this precise inference apparently sought by defendant. Yet, significance necessarily attaches to the fact that Chino's testimony did not actually inculpate defendant.

Given the guidepost provided in *Sims*, we fail to perceive Chino's testimony as more damaging to defendant than if he had never been

called. *Sims*, 285 Ill. App. 3d at 610, 673 N.E.2d at 1127. In contrast, the prior statement of the witness sought to be elicited in *Chambers* actually incriminated the witness and tended to exculpate the defendant. That is plainly not the case here. We cannot conclude that the proposed testimony would have been useful to the proceedings. *Sims*, 285 Ill. App. 3d at 610, 673 N.E.2d at 1127. Manifestly, the import of such testimony would have exceeded the proper purpose of impeachment and tended to lead the jury to believe the truth of the impeaching statement rather than calling into question Chino's credibility. See *Barton*, 286 Ill. App. 3d at 961, 677 N.E.2d at 481.

### The Curative Effect of Illinois Pattern Jury Instructions Criminal 4th No. 3.11

Defendant contends the use of Illinois Pattern Jury Instructions, Criminal, No. 3.11 (4th ed. 2000) (hererinafter IPI Criminal 4th), limiting the scope of consideration of prior inconsistent statements, was a safeguard against the jury improperly considering the proposed testimony substantively. Likewise, her counsel's assurances that the closing argument would not urge the jury to consider such testimony substantively provided another safeguard to make way for this desired line of impeachment. In nearly the same breath, she claims the defense "should have been given the opportunity to cast doubt on Chino's credibility where he testified that he did not hurt his brother." We disagree on each point and observe that courts have deemed reversals appropriate even where such limiting jury instructions were given. See *Cruz*, 162 Ill. 2d at 366, 643 N.E.2d at 661.

The record establishes that doubt was cast on Chino's credibility by his own words and pattern of lying and admitting to it on the stand. It is difficult to imagine what more could be accomplished by permitting the other three witnesses to testify. The inference the defense sought was already in play, *i.e.*, that Chino might have been the one to hurt his brother. Submitting additional testimony that he said he hurt his brother, despite his denials at trial, in our view exceeds the bounds of proper impeachment by a wide measure and poses a serious risk that any such testimony would be considered substantively by the jury. See *Gacho*, 122 Ill. 2d at 252, 522 N.E.2d at 1161. Considered against this record, we cannot conclude that instructing the jury pursuant to IPI Criminal 4th No. 3.11 was sufficient to insulate the proposed testimony against improper consideration by the jury.

### The Trial Court's Consideration of Chino's Competency

Defendant boldly claims the trial court erred when it considered Chino's competence as a witness in determining whether to allow the

proposed impeachment as evidence. Specifically, defendant claims the trial court found Chino incompetent to testify and then erred in "doing nothing" in the wake of that determination. Even more incongruously, defendant asserts the trial judge "was *prohibited* from doing nothing about Chino's competency, and by his inaction, denied Stephanie the right to present a defense." (Emphasis added.) Defendant fails to cite to any authority to support such novel and peculiar arguments. Moreover, a careful review of this portion of the record conclusively undermines this claim and its supporting logic.

■ The trial judge's comments about Chino's testimony were not in our view a finding of incompetency. He said, "frankly, I don't believe Chino is a competent witness to testify." His comments are more properly classified as either thinking aloud or playing the devil's advocate in the context of considering the proposed witnesses. Notably, the parties chose to forego a competency hearing earlier and there was nothing to accomplish in conducting such a hearing at this stage. While defendant now faults the trial judge for "doing nothing," we note that neither party suggested striking Chino's testimony. Moreover, the defense benefitted by his testimony—though probably not to the extent hoped—when he testified that defendant was not alone with Nyshon at the time of the injuries. The tenability of defendant's position decreases with each consideration. Had Chino's testimony been stricken, by motion of the parties or by the trial judge *sua sponte*, defendant would have lost any benefit from it. As noted, there was certainly some benefit inuring to defendant from that testimony. Therefore, it defies logic and common sense that defendant would now complain of the court's handling of Chino's testimony.

We further discern this claim of error to be pure sophistry. Defendant chose to call Chino and got some benefit from his testimony. Even if his testimony was stricken, in light of retroactive finding of incompetency, it would be of no help to defendant's case. Parties are not permitted to complain of errors they induced or participated in at trial. *Hill v. Cowan*, 202 Ill. 2d 151, 159, 781 N.E.2d 1065, 1069 (2002). Here, any error regarding the testimony of Chino was initiated, at least in part, by defendant's choice to proceed without first conducting a competency hearing or seeking an *in limine* ruling. Even still, defendant's argument is subject to further frailties when it is considered against the full context. It is readily apparent that the trial court's decision to preclude the proffered testimony was founded upon the defense's inability to demonstrate a proper purpose for that testimony other than to place improper substantive evidence before the jury. The trial court's comments about Chino's competency were collateral to the issue to be decided, clearly did not figure into the

ultimate conclusion, and were not erroneous. See *Caffey*, 205 Ill. 2d at 89-90, 792 N.E.2d at 1188 (evidentiary determinations require courts to consider all the facts and circumstances involved).

## Substantive Use of Chino's Prior Statements

■ Had Chino's purported statements been made under different circumstances, they perhaps could have qualified for admission pursuant to section 115—10.1 of the Code of Criminal Procedure of 1963. 725 ILCS 5/115—10.1 (West 2004). While this section is not specifically invoked, the trial judge's comments and analysis persuade that its applicability was considered.

The precise genesis of this statute is disputed in the literature. See R. Steigmann, *Prior Inconsistent Statements as Substantive Evidence in Illinois*, 72 Ill. B.J. 638 (1984) (claiming authorship of the draft legislation giving rise to section 115—10.1 based upon and inspired by M. Graham, *Employing Inconsistent Statements for Impeachment and as Substantive Evidence: A Critical Review and Proposed Amendments of Federal Rules of Evidence, 801(d)(1)(a), 613 and 607*, 75 Mich L. Rev. 1565 (1977)); J. McDonnell, *Admissibility of Prior Inconsistent Statements: Further Protection Against the "Turncoat" Witness*, 73 Ill. B.J. 212, 213 (1984) (attributing legislation to "General Assembly's own appraisal of virtually the same arguments presented" to the supreme court in *People v. Collins*, 49 Ill. 2d 179, 274 N.E.2d 77 (1971)); and M. Krauskopf, *Prior Inconsistent Statements as Substantive Evidence: Illinois Takes the Sting Out of the Turncoat Witness*, 19 J. Marshall L. Rev. 69, 78 (1985) (section 115—10.1 was enacted: (1) because judicial adherence to *Collins*, 49 Ill. 2d 179, 274 N.E.2d 77, demonstrated a "lack of judicial initiative"; and (2) "in an attempt to aid in the truth-seeking [function]"). Nevertheless, the legislation represented a determination by the Illinois legislature that "under certain circumstances, prior inconsistent statements in criminal cases are admissible as substantive evidence." 72 Ill. B.J. at 638.

Justice Steigmann, who claims authorship of the draft of the eventual enactment, described policy rationales behind the legislative support for it thusly:

> "(1) substantive admissibility is desirable because the proximity of prior statements to the event makes them more trustworthy than in-court testimony; (2) substantive admissibility will protect parties from turncoat witnesses; (3) the hearsay problems are eliminated because the witness is in court and subject to cross-examination; and (4) jurors had difficulty distinguishing between statements admitted substantively and those admitted solely to impeach a witness' credibility when the prior law permitted a jury to hear that

witness' prior inconsistent statement. Last, this legislative action is consistent with the conclusion urged by the sponsors of section 115—10.1 that, to the extent criminal trials are to be a search for the truth, the rule barring substantive admissibility of prior inconsistent statements constituted an unnecessary impediment to that goal." 72 Ill. B.J. at 638.

However, this section does not serve to make the whole universe of prior inconsistent statements admissible; the determination of admissibility still depends upon the relevance and materiality of the proffered evidence. 72 Ill. B.J. at 639. Justice Steigmann points out that "the rules severely restricting the use of prior inconsistent statements for impeachment purposes only ought to be more strictly adhered to—not less. To do otherwise would reward sloppy investigative practices and would remove the incentive to comply with the new statute." 72 Ill. B.J. at 643.

Section 115—10.1 provides:

"In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if

(a) the statement is inconsistent with his testimony at the hearing or trial, and

(b) the witness is subject to cross-examination concerning the statement, and

(c) the statement—

(1) was made under oath at a trial, hearing, or other proceeding, or

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

(A) the statement is proved to have been written or signed by the witness, or

(B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial, hearing, or other proceeding, or

(C) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording.

Nothing in this Section shall render a prior inconsistent statement inadmissible for purposes of impeachment because such statement was not recorded or otherwise fails to meet the criteria set forth herein." 725 ILCS 5/115—10.1 (West 2004).

While this section grants broad discretion to the trial court to determine admissibility, it cannot be used to support admission of evidence that is either irrelevant or unfairly prejudicial. *People v.*

*Radovick*, 275 Ill. App. 3d 809, 820, 656 N.E.2d 235, 243 (1995). As this concerns the admission of evidence, a matter within the trial court's discretion, we will not disturb such rulings unless it is clear there was an abuse. *People v. Thomas*, 171 Ill. 2d 207, 218, 664 N.E.2d 76, 83 (1996).

Here, the record clearly reflects that Chino's alleged statements to these three witnesses were inconsistent with his testimony at trial and that he was subject to cross-examination. However, they were not made under oath. While the alleged statements do arguably narrate, describe or explain something purportedly within Chino's personal knowledge, they were all made orally and not otherwise memorialized or acknowledged. Despite the flexibility evinced in the rule for admitting prior inconsistent statements for impeachment purposes, we do not find that these satisfy the criteria of section 115—10.1.

Mindful of the requirement that the presentation of prior inconsistent statements, whether used for impeachment or substantively, necessarily requires the laying of a proper foundation (*People v. Hallbeck*, 227 Ill. App. 3d 59, 62-63, 590 N.E.2d 971, 972-74 (1992)), the record reflects only questions about whether Chino made the statements and no inquiry as to the time, place, or circumstances in which they were made. See also *People v. Edwards*, 309 Ill. App. 3d 447, 457, 722 N.E.2d 258, 265 (1999) (Steigmann, J. specially concurring) (expanding on the foundational requirements for section 115—10.1 use of a prior inconsistent statement). Consequently, section 115—10.1 does not support the admissibility of the proposed impeachment where there was no proper foundation laid for them and the threshold requirements of the statute were not met.

## Admissibility of Chino's Prior Statements as Declarations Against Penal Interest

■ Last, defendant asserts that Chino's extrajudicial statements should have been admitted as declarations against penal interest, an exception to the hearsay rule. We observe that the trial judge raised this alternative theory *sua sponte* when contemplating the admissibility of this evidence. Defendant maintains that the trial court's determination that Chino's out-of-court statements did not satisfy the requirements of this hearsay exception was error thereby preventing her from presenting a meaningful defense to the charges.

Notably, we perceive that defendant's argument markedly varies from the position offered at trial, disclaiming that Chino injured Nyshon. Rather, defense counsel unequivocally stated:

> "Our position, Judge, is that we don't know who did it. Chino was there. We on a personal level we think that this is an accident. That is not what we are trying to establish to the jury."

Accordingly, we find somewhat disingenuous defendant's present argument that essentially maintains that Chino was the one who caused the injury. Nonetheless, we will consider the merits of this newly advanced claim.

Generally, hearsay evidence is testimony of an out-of-court statement offered for the truth of the matter asserted and thus resting for its value upon the credibility of the out-of-court asserter. *People v. Carpenter*, 28 Ill. 2d 116, 121, 190 N.E.2d 738, 741 (1963); see also C. McCormick, Handbook of the Law of Evidence §225 (1954). Historically, an unsworn extrajudicial statement by the declarant that he, and not the defendant on trial, committed the crime was inadmissible as hearsay though the declaration was against the declarant's penal interest. *People v. Lettrich*, 413 Ill. 172, 178, 108 N.E.2d 488, 491-92 (1952); see also *People v. Williams*, 131 Ill. App. 3d 597, 606, 475 N.E.2d 1082, 1088 (1985).

However, an exception to this rule evolved to the extent that declarations against penal interest will be admitted where justice requires. See *People v. Tenney*, 205 Ill. 2d 411, 433, 793 N.E.2d 571, 585 (2002); *Lettrich*, 413 Ill. at 178, 108 N.E.2d at 492. The justification for this exception is founded on the assumption that a person is unlikely to fabricate a statement against his or her own interest. *Tenney*, 205 Ill. 2d at 433, 793 N.E.2d at 585, citing *Chambers v. Mississippi*, 410 U.S. 284, 299, 35 L. Ed. 2d 297, 311, 93 S. Ct. 1038, 1047-48 (1973). In *Tenney*, our supreme court summarized the rule and its application:

> "Accordingly, an unsworn, out-of-court declaration that the declarant committed the crime, and not the defendant on trial, is generally inadmissible, even though the declaration is against the declarant's penal interest. Such a declaration will be admitted, however, where justice requires." *Tenney*, 205 Ill. 2d at 433, 793 N.E.2d at 585.

As the Supreme Court held in *Chambers*, "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Chambers*, 410 U.S. at 302, 35 L. Ed. 2d at 313, 93 S. Ct. at 1049. Accordingly, such declarations may be admitted where there is sufficient indicia of trustworthiness. *Chambers*, 410 U.S. at 302, 35 L. Ed. 2d at 313, 93 S. Ct. at 1049.

Our analysis in the case *sub judice* is guided by the objective indicia of trustworthiness enumerated in *Chambers* for judging the reliability of such statements. Those factors are: (1) whether the statement was made spontaneously to a close acquaintance in close temporal proximity to the offense; (2) whether some other evidence

corroborates the alleged statement; (3) whether the statement is, in fact, self-incriminating and against the declarant's interest; and (4) whether adequate opportunity was afforded to cross-examine the declarant. *Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 311-12, 93 S. Ct. at 1048-49. Admissibility does not require the satisfaction of each of these elements; they are merely guideposts for the analysis. *Tenney*, 205 Ill. 2d at 435, 793 N.E.2d at 586; see *People v. Bowel*, 111 Ill. 2d 58, 68, 488 N.E.2d 995, 1000 (1986). Nor are credibility determinations implicated in the analysis. *People v. Kokoraleis*, 149 Ill. App. 3d 1000, 1019, 501 N.E.2d 207, 220 (1986).

The *Chambers* factors are not a limitation on trial courts and additional factors can be considered in evaluating a statement's trustworthiness. *People v. Anderson*, 291 Ill. App. 3d 843, 850, 684 N.E.2d 845, 849 (1997); see also *People v. Swaggirt*, 282 Ill. App. 3d 692, 700, 668 N.E.2d 634, 641 (1996) (just as the *Chambers* factors are not prerequisites, satisfaction "of one or more of the factors does not make a statement trustworthy"). The focus of the determination is instead on "whether [the statement] was made under circumstances which provide considerable assurance of its reliability by objective indicia of trustworthiness." *Caffey*, 205 Ill. 2d at 97, 792 N.E.2d at 1192; see also *People v. Thomas*, 171 Ill. 2d 207, 216, 664 N.E.2d 76, 81 (1996); *People v. Pecoraro*, 175 Ill. 2d 294, 307, 677 N.E.2d 875, 882 (1997).

We are, to be sure, cognizant that out-of-court statements are not typically uttered in "circumstances that impress the speaker with the solemnity of his statements." *Chambers*, 410 U.S. at 298, 35 L. Ed. 2d at 311, 93 S. Ct. at 1047. Conversely, statements made in custody to law enforcement are "more likely than not to be trustworthy." *Kokoraleis*, 149 Ill. App. 3d at 1021, 501 N.E.2d at 221; see *People v. Jones*, 302 Ill. App. 3d 892, 899, 707 N.E.2d 192, 197 (1998). The reliability or trustworthiness of an out-of-court statement is weighed against the totality of the circumstances and the conclusion thereon will not be disturbed unless it constituted an abuse of discretion. *Anderson*, 291 Ill. App. 3d at 849, 684 N.E.2d at 848; see also *People v. Williams*, 193 Ill. 2d 1, 20, 737 N.E.2d 230, 241-42 (2000).

Here, defendant claims the statements purportedly made by Chino to his aunt, Salina Ford, and to his maternal grandmother, Demetrius Bonds, satisfy the four factors in *Chambers*' indicia of trustworthiness. Defendant likewise maintains that three of the factors are satisfied as to the alleged statement to DCFS caseworker Karen Wilson, as well as an additional factor supporting admission. We disagree.

Our analysis commences by considering whether Chino's alleged statements were spontaneously made to a close acquaintance as

provided in the first *Chambers* factor. Defendant's analysis glosses over the spontaneity of the statements and solely argues that this factor is satisfied because Chino's aunt and grandmother were close acquaintances by virtue of being family relations. Yet, the closeness of their relationship is not evident in the record. Likewise, no mention is made of the second aspect of that factor, namely, the spontaneity of the statement with respect to the subject matter of the injury. We perceive that the record reveals little support for a claim that the statements were made spontaneously. The only reference even hinting at it appears when Chino was asked: "Do you remember a day or two after your mother was arrested in this case talking with your Aunty Salina?" On the record before us, we do not conclude this factor was satisfied as to either witness.

Additionally, this indicia is clearly lacking as to the DCFS caseworker on either account as there is no indication she was a close acquaintance or that the statement was made spontaneously. The only information providing any link to its timing is Chino's purported statement that he "dropped Nyshon on Friday and Nyshon is now in heaven." This does not appear particularly spontaneous given objective evidence demonstrating that the injuries were inflicted on June 1, 2005, and Nyshon died three days later.

Moreover, we recognize the timing of the statement is not the sole aspect determinative of spontaneity in our view. Rather, spontaneity is also dependent on the context of the statement. There is no context in the record as to the statements made to Chino's aunt or his grandmother. Likewise, we have no context for the statement to the caseworker, other than the question noted. In each case, some meaningful foundational questions would have aided the analysis of this factor. Without knowing more about how the statements were elicited and when and where they were made, we are unable to determine that they were spontaneous.

Considering the second *Chambers* factor of corroborating evidence, defendant claims the statements corroborated one another. The circular nature of this logic is manifest. Defendant does not cite any authority for this particular brand of corroboration and offers only a citation cautioning judges not to be too stringent in judging corroboration. Nonetheless, the most defendant is able to muster on this point is that, "Chino made a total of three inculpatory statements that are all similar." Plainly, this ignores the absence of any context for the statements and the fact that only Chino's denials were in evidence. See *Chambers*, 410 U.S. at 300, 35 L. Ed. 2d at 312, 93 S. Ct. at 1048 ("each one was corroborated by some other evidence *in the case*" (emphasis added)).

Defendant also posits that the statements are somehow corroborated "by the trial testimony which showed that Chino was angry because a neighbor accused him of either stealing a ball or setting her garage on fire." In making this claim, defendant makes a leap of logic not supported by reason or the record. Additionally, other evidence in the record undermines this position.

Defendant's statement to the police is a powerful and compelling piece of evidence of the source of Nyshon's injuries which plausibly explains their extent and nature. Moreover, the assistant medical examiner's testimony called into question the veracity of defendant's implicit allegation that Chino was the source of the injuries to Nyshon. Although the record indeed supports the conclusion that injuries were sustained in part when he was dropped, Chino's alleged statements are simply not corroborated by the extent of the injuries. Significantly, the testimony taken from the law enforcement witnesses, an assistant State's Attorney and two of the investigating detectives contains only limited references to Chino. None of those references relate in any fashion to his having any culpability or claims that he was the cause of his brother's injuries.

Defendant claims yet another factor supports admission of the DCFS caseworker's statement and consequently corroborates the proposed testimony of Chino's grandmother and his aunt. Thus the defendant posits that Chino's alleged statement to her is one of "unbiased corroboration" and that nothing was to be gained by Chino in claiming responsibility for injuring Nyshon when he spoke with the caseworker. Defendant boldly claims, "If he was making false confessions in order to attempt to exculpate his mother, then he would not have denied making the statements at trial." We disagree, finding this to be a dubious position in light of Chino's age and pattern of dishonesty. We fail to see how bias is relevant to the calculus. By this logic, Chino's aunt's and grandmother's claims were potentially motivated by bias. Nonetheless, we do not perceive that the relationship between Chino and the caseworker contributes reliability or trustworthiness. The record reveals little about the depth and extent of Chino's relationship with any of these three women. There is certainly nothing to persuade us that bias came into play.

We turn, then, to the third *Chambers* factor, whether the alleged statements were actually self-incriminatory to Chino and against his interest. Unquestionably, a statement claiming responsibility for inflicting an injury to an infant who later dies is extremely likely to be incriminating and equally against one's interest. However, concluding so in the context of the facts *sub judice* is a more difficult task.

Chino was six years old at the time Nyshon was injured and eight years old at the time of trial. The trial judge observed his youth on the stand and noted his apparent inability to appreciate the difference between truth and fiction. The record does not convince us that assuming, *arguendo*, Chino made the statements attributed to him, that he could comprehend their incriminating nature or their relation to his self-interest. These considerations engender serious doubt that Chino could fully appreciate the pitfalls of self-inculpation or his penal interest.

Turning to the fourth factor, we find adequate opportunity to cross-examine the declarant did exist. Since Chino was called as a defense witness, the relevance of cross-examination is unclear in this context. Even still, he was subject to direct examination, cross-examination, as well as redirect examination. See 188 Ill. 2d R. 238(a); see also *People v. Tate*, 87 Ill. 2d 134, 144, 429 N.E.2d 470, 476 (1981) (declarant was subject to cross-examination but other indicia of reliability were lacking). Additionally, as discussed previously, no meaningful foundation was laid for presenting the impeachment of Chino's denial. The net value of the testimony, insofar as trustworthiness and reliability, was to deny the alleged statements and admit to having lied repeatedly on and off the stand. Considering this factor alone, we are given great pause as to the reliability of any statement made by Chino, regardless of the context. The record makes clear that the trial judge had similar misgivings.

Given the state of the record, we agree with the trial court's conclusion that Chino's statements were lacking "considerable assurance" of their reliability. See *Caffey*, 205 Ill. 2d at 97, 792 N.E.2d at 1192. Likewise, there are no additional factors apparent in the record tending to demonstrate these statements were otherwise trustworthy. See *Anderson*, 291 Ill. App. 3d at 850, 684 N.E.2d at 849; *People v. Swaggirt*, 282 Ill. App. 3d 692, 700, 668 N.E.2d 634, 641 (1996). Therefore, the alleged statements did not satisfy the prerequisites for admission as against Chino's penal interest. See *Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 311-12, 93 S. Ct. at 1048-49. Consequently, the trial court did not err in barring their admission.

## Harmless Error

There is no need to consider whether any error was harmless beyond a reasonable doubt as we find no error in the trial court's evidentiary rulings. See *People v. Patterson*, 154 Ill. 2d 414, 447, 610 N.E.2d 16, 30 (1992). The trial judge was consistently at the forefront of each issue arising at trial. We find his actions and decisions to be utterly without error throughout the proceedings.

## One Act, One Crime

■ Last, defendant asks us to correct the mittimus to reflect only one conviction for murder, according to the one-act, one-crime doctrine. See, *e.g.*, *People v. Wesley*, 382 Ill. App. 3d 588, 594, 888 N.E.2d 681, 686 (2008). The State is in agreement. Therefore, pursuant to our powers granted by Supreme Court Rule 615(b)(1), we order the mittimus to be corrected to reflect a single conviction of murder. 134 Ill. 2d R. 615(b)(1).

In light of defendant's having prevailed on the issue of the mittimus, the assessment of costs payable to the State for defending this appeal is inappropriate. See *People v. Merrero*, 121 Ill. App. 3d 716, 723-24, 459 N.E.2d 1158, 1164 (1984). Therefore, we deny the State's request for costs as to the defense of the appeal as well as for oral argument.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed. The mittimus shall be corrected by deleting defendant's conviction for first degree murder on count I.

Affirmed and mittimus corrected.

FITZGERALD SMITH, P.J., with TULLY, J., concur.